795 So.2d 788 (2000)
Joseph Clifton SMITH
v.
STATE.
CR-98-0206.
Court of Criminal Appeals of Alabama.
May 26, 2000.
Rehearing Denied August 25, 2000.
*796 Glenn L. Davidson, Mobile, for appellant.
Bill Pryor, atty. gen.; and J. Clayton Crenshaw and Thomas F. Parker IV, asst. attys. gen., for appellee.
PER CURIAM.
The appellant, Joseph ("Jody") Clifton Smith, was convicted of murdering Durk Van Dam during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to death. The trial court accepted the jury's recommendation and sentenced Smith to die in Alabama's electric chair at a date to be set by the Alabama Supreme Court.
The State's evidence tended to show the following. On November 25, 1997, police discovered the badly beaten body of Durk Van Dam in his mud-bound Ford Ranger truck in a wooded area near Shipyard Road in Mobile County. Dr. Julia Goodin, a forensic pathologist for the Alabama Department of Forensic Sciences, testified that Van Dam died as a result of 35 different blunt-force injuries to his body. Van Dam had marks consistent with marks made by a saw on his neck, shoulder, and back; he also had a large hemorrhage beneath his scalp, brain swelling, multiple rib fractures, a collapsed lung, multiple abrasions to his head and knees, and defensive wounds on his hands. Dr. Goodin testified that the multiple rib fractures that caused one lung to collapse were probably the most immediate cause of death.
Smith gave two statements to the police. In the first statement he denied any involvement in the robbery-murder but said that he was with Larry Reid when Reid beat and robbed Van Dam. Smith denied taking anything from the victim. When police were questioning Reid, Smith repeatedly knocked on the interrogation room door and requested to talk to the officer who had taken his first statement. In his second statement Smith admitted that he and Reid had planned to rob Van Dam because they had been told that Van Dam was carrying $1,500 in cash. Smith said that he, Reid, and Van Dam left the Highway Host motel in Van Dam's red truck on November 23, 1997. Van Dam was driving. Reid directed Van Dam, who had been drinking, to an isolated location. Once there, Reid began hitting Van Dam. He said that when Reid kicked Van Dam in the face he thought Van Dam was dead. Smith said that Van Dam then got up and Smith hit him on the head with his fist, kicked him in the ribs several times, threw a handsaw at him, and may have hit him with a hammer but he wasn't entirely sure because he suffers from blackouts. Reid then got a power saw from the back of Van Dam's truck, Smith said, and ran the saw against Van Dam's neck. Smith held Van Dam down while Reid took the money from his pockets. Smith and Reid then attempted to move the truck, because they had planned to steal it, but it got stuck in the mud. Smith also admitted that he took the victim's boots, because his shoes were wet, and that he took the victim's tools. The two discussed where to take Van Dam's body and Smith suggested that they take it to a nearby lake. However, they left the body, Smith said, under a mattress near Van Dam's truck. Smith said that when they divided the money he got only $40 and Reid kept the rest, approximately $100. Smith also told police that he had just been released from custody *797 on Fridaytwo days before the robbery-murder on Sunday.[1]
Russell Harmon testified that on November 23, 1997, he went to the Highway Host motel and saw Reid and Smith. He said that Smith told him that they were going to rob Van Dam and asked if he wanted to join them. Harmon declined and left the motel. Later that day he went back to the motel to see if the two had been successful with their plans. He said that Smith told him that he had beaten the victim on the head and that he had cut him with a saw. On cross-examination he admitted that he could not swear that Smith was the one who said he had cut Van Dam in the back but that it could have been Reid who made this statement. However, on cross-examination Harmon reiterated that Smith told him that he "hit the man, beat the manhit the man in the head and cut him." (R. 340.) Harmon testified that Smith asked him to go with him to get the tools from where he had left them in the woods. He said that he went with Smith and that they got the tools and took them to a pawnshopSmith received $200 for the tools. Harmon testified that he was currently in the county jail because his probation had been revoked.
M.A.[2] testified that she was living at Highway Host motel with her mother and sister at the time of Van Dam's murder. She said that her sister, M., was dating Smith. M.A. testified that on November 23, 1997, she saw Smith, Reid, and Van Dam drive away from the motel in a red truck. She said that when Smith and Reid returned sometime later they were in a black car, Van Dam was not with them, and Smith had blood on his clothes. M.A. testified that Smith told her that he had hit, cut, and stabbed Van Dam in the back.
Patty Milbeck testified that she saw Smith, Reid, and Van Dam on the day of the robbery-murder. When they returned, she said, Van Dam was not with them and Smith appeared nervous. Smith told her that Van Dam had become angry and left. Milbeck stated that at the time of her trial testimony she was in jail because she failed to report to her probation officer.
Joey Warner, an employee of 24-Hour Pawn pawnshop, testified that on November 23, 1997, Smith pawned several tools including saws, drills, and a router. He was given $200 and he showed his Alabama Department of Corrections identification card as identification to pawn the tools. (Supp. R. 92.)

Standard of Review
Because Smith has been sentenced to death, this Court must review each issue raised in Smith's brief, even if the issue was not first presented to the trial court. This Court must also review the record to determine if there is any "plain error" i.e., error that has adversely affected the substantial rights of the appellant, see Rule 45A, Ala.R.App.P., even though the issue was not raised in Smith's appellate brief to this Court.
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing *798 an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, [Ms. CR-94-0661, October 18, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999).

Guilt-Phase Issues

I.
Smith argues that "the trial court violated Mr. Smith's rights to a capital trial free from arbitrariness when it randomly removed a juror from the venire." (Appellant's brief to this Court, p. 89.) The following occurred after the trial court granted strikes for cause:
"The Court: Okay. So that means we have lost one, two, three, four, five, six, seven, eight, nine. That means we've got 39. All right. Lesley [court reporter], give me any number between 1 and 48."
"The Court Reporter: Thirty-five.
"The Court: Ma'am?
"The Court Reporter: Thirty-five.
"The Court: All right. Thirty-five. Gentlemen, strike 35. All right. All right. That leaves 38."
(R. 111.)
Initially, we observe that no objection was made to the court's using the court reporter to strike one juror so that the State and the defense would have an even number of strikes. Our review, therefore, is limited to determining whether plain error occurred. Rule 45A, Ala.R.App.P.
Section 12-16-100(a), Ala.Code 1975, addresses the drawing, selection, and empaneling of juries in criminal cases and states in part:
"In every criminal case the jury shall be drawn, selected and empaneled as follows: Upon the trial by jury in the circuit courts of any person charged with a felony, including a capital felony, a misdemeanor, or violation, the court shall require a strike list or lists to be compiled from the names appearing on the master strike list as established in Section 12-16-74. In compiling the list or lists, names of qualified jurors may be omitted on a nonselective basis. ..."
(Emphasis added.) This same provision is also contained in Rule 18.4(a), Ala. R.Crim.P.
Clearly, the trial court was authorized by law to remove this prospective juror. There is no argument that this prospective juror was not removed on a "nonselective basis," indeed, Smith's argument states that this prospective juror was "randomly struck." No error, much less plain error, occurred here.

II.
Smith argues that he was denied an impartial and unbiased jury because the trial court denied his request for individual sequestered voir dire examination.
*799 The following occurred at a pretrial hearing regarding Smith's motion for individual voir dire:
"Mr. Hughes [defense counsel]: Judge, I don't have anything other than what was stated in the motion, as far as that goes.
"The Court: It's my understanding, based on my review of the Alabama law, that there's no requirement to individual voir dire in a capital case.

"Mr. Hughes: I think you're correct, Judge.

"The Court: And so the lawyers will know exactly what I intend to do, we will qualify our panel generally, meaning the panel in its entirety. Those who express particular reservations about the death penalty or those who indicate that they would automatically impose it will then be reduced to smaller groups, in the past, usually done in groups of three or five.
"I don't know that pretrial publicity is an issue in this case, but if you all think that, too, is something that needs to be gone into with those who express some knowledge, we'll sure do that.
"But my plan is to qualify them generally and then separate those folks whose responses create a death-penalty issue or pretrial publicity issues.
"I would also ask that I get from each lawyer a list of proposed voir dire questions by 5:00 p.m. on Friday, September 11, the Friday before we go to trial on Monday...."
(R. 7-8) (emphasis added). Defense counsel's own words indicate that he was aware that there is no right to individual voir dire in a capital case.
The Court gave the venire the following instruction prior to voir dire examination:
"The Court: ... If the answer to a question is something that you find to be of a particularly sensitive or personal nature that you don't want to share with 48 strangers, I understand that. And if you find yourself in that situation where the answer to a question applies to you, but you don't want to share it with the rest of your fellow jurors, you are free to come up here to the bench and outside the hearing of the rest of your fellow jurors tell us whatever your response is."
(R. 15-16.)
The record reflects that the trial court did grant individual voir dire to the extent that any juror who thought his or her answer was sensitive could be questioned outside the presence of the remaining veniremembers.
"`"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court." Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App.1992). "The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion." Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App. 1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).'
"Taylor v. State, 666 So.2d 36, 66 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Smith v. State, 727 So.2d 147 (Ala. Cr.App.1998); and George v. State, 717 So.2d 827 (Ala.Cr.App.), aff'd in pertinent part, 717 So.2d 844 (Ala.1996), aff'd. *800 on return to remand, 717 So.2d 849 (Ala. Cr.App.1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998). Perkins offered no evidence in the trial court to show how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to individually, regarding their views on capital punishment. On appeal, he offers only general arguments concerning the possibility of prejudice and fails to show that any comments by a prospective juror improperly influenced other members of a panel.
"`A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion.' Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). A careful review of the record reveals that the method of voir dire employed by the trial court was sufficient to `provide[] reasonable assurance that prejudice would have been discovered if present.' Haney [v. State], 603 So.2d [368] at 402 [ (Ala.Crim.App. 1992) ]. Accordingly, we find that the trial court did not abuse its discretion by denying Perkins's motion for individual, sequestered voir dire examination regarding the veniremembers' views on capital punishment."
Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___, ___ (Ala.Cr.App.1999). See also Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999) and Whitehead v. State, 777 So.2d 781 (Ala.Cr.App.1999).
This case is similar to Perkins. Smith has offered no specific allegations that any prospective juror was prejudiced by the answers of another prospective juror. The trial court's method of voir dire examination was sufficient.

III.
Smith argues that the trial court committed reversible error, and violated the United States Supreme Court's holding in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), by removing a prospective juror for cause for the sole reason, he argues, that the juror had expressed mere reservations about the death penalty.
The following occurred during defense counsel's voir dire examination of prospective juror M.C.:
"The Court: Hi, Mr. [C.] When we were asking questions earlier this morning about the death penalty you indicated that neither your conscience nor your convictions, if I heard you correctly, would allow you to impose a penalty of death by electrocution in any circumstance. Is that right, sir?
"[M.C.]: Correct.
"The Court: All right. The law requires that I give the lawyers for both sides the opportunity to ask you any follow-up questions, if in fact they have any, outside the presence of the rest of the jury, which is why we are here at this stage.
"So, Mr. Hughes [defense counsel], do you have any questions of Mr. [C.]?
"Mr. Hughes: Mr. [C.], you have not heard any of the facts in this case at this point. If you heard the facts, all the details in this whole business, and the Judge tells you how you must consider the facts, and if you were satisfied from the facts that Mr. Smith had done all of the things they have alleged in this case and you at that point sayvoted and the jury voted to convict Mr. Smith of capital murder and then you were presented with evidence, some that might be what *801 are called aggravating factors that would make it seemor the State's position that it ought to carry the death penalty and mitigate the factors from the defense that would say you ought not to put him in the electric chair, that really the correct decision would be life without parole, and the Judge would tell you to consider these factors and weigh one against the other, would you be able to follow the Judge's instructions and do that?
"[M.C.]: I would probably lean toward life without parole if theI probably wouldn'tI wouldn't consider the death penalty. That's it. That's just
"Mr. Hughes: Are you sayingWell, let me ask you this. I believe you told us earlier that your brother had been robbed and hit on the head.
"[M.C.]: He had an incident. Yeah, there was an incident.
"Mr. Hughes: All right. And thank God it didn't come to pass, but just to give us a talking point here, had your brother been killed would you feel that that would thenmight be something that would justify the electric chair for somebody that might have done that?
"[M.C.]: I wouldn't have votedI mean, if they had killed him I wouldn't. I wouldn'tI wouldn't have gaveI couldn't have gave them the electric chair. Maybe somebody else would, but I wouldn't."
(R. 91-93.)
The standard we use in determining whether a prospective juror was properly struck for cause based on opposition to the death penalty was discussed by this Court in Pressley v. State, 770 So.2d 115, 127 (Ala.Cr.App.1999), aff'd, 770 So.2d 143 (Ala.2000). In Pressley we stated:
"The `original constitutional yardstick' on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremember's views would `"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."` The Supreme Court has expressly stated that juror bias does not have to be proven with `unmistakable clarity.' Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
It is clear from the quoted discussion with this prospective juror that this juror never wavered in his conviction that he would be unable to consider a death sentence under any circumstances. This juror even indicated that if his brother had been killed he could not vote to execute the killer. This juror had views towards the death penalty that would have impaired his duties as a juror in this capital case. The trial court properly struck this prospective juror for cause.
In a footnote to Smith's brief to this Court Smith states that he was never given the opportunity to individually question veniremembers as to whether they had fixed opinions in favor of the death penalty. Smith's argument is not supported by the record and is raised for the first time *802 on direct appeal. See Rule 45A, Ala. R.App.P. The record reveals that the trial court asked the prospective jurors the following questions:
"The Court: ... Please forgive me for being somewhat repetitive, but the law requires that we identify each prospective juror by name and get that individual's precise response on the record. So that's why you're hearing some of these questions asked over and over again.
"Now, there's a flip side to that question, which is this. If the State were to meet its burden of proof and satisfy you that the Defendant was guilty beyond a reasonable doubt of an intentional killing in the course of a robbery, is there any one of you who would automatically vote to impose a penalty of death by electrocution?
"(No response.)"
(R. 58-59.)
Later, during defense counsel's voir dire examination the following occurred:
"Mr. Hughes [defense counsel]: Do any of you feel, just as a matter of conscience, that if a person participates in any activity that results in another person dying that the person who is the actor in the activity forfeits his right to live, just because someone dies as a result, directly or indirectly, of their actions?
"(No response.)
"Mr. Hughes: Do any of you feel that imprisonment is too easy of a punishment for someone who has killed another?
"(No response.)
"Mr. Hughes: Would all of you be willing to consider in the event there is a convictionLet me rephrase that. Are there any of you who would not be willing to consider a punishment of life imprisonment without parole in the event there should be a conviction for capital murder? Is there anybody that would automatically say that's not an option?
"(No response.)"
(R. 82-83.)
After the general voir dire questioning, the court excused all of the jurors except the ones who had responded to the question about their opposition to the death penalty. These prospective jurors were individually questioned. At no time did defense counsel object to the lack of any further questioning concerning the prospective jurors' views in favor of the death penalty. In fact, each time a question was asked concerning this issue no prospective juror responded. Smith's allegation is not supported by the record.
Moreover, "this court has held that the failure of the trial court to question potential jurors concerning their views in favor of the death penalty does not constitute plain error. Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)." Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

IV.
Smith next argues that the State violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using its peremptory strikes to remove black prospective jurors based on their race. Smith contends that the record reflects that of the 13 blacks on the venire the State removed 8 by its peremptory strikes. He contends that the record supports his entitlement to a Batson hearing because, he says, the record establishes a prima facie case of racial discrimination. We do not agree.
*803 There was no Batson objection to the State's use of its peremptory strikes. Smith contends that the strike list supports his motion to remand for a Batson hearing because it shows that 8 of the State's 13 strikes were used to remove prospective black jurors. We note that the strike list also reflects that defense counsel used every one of it 13 strikes to remove white prospective jurors.[3] The strike list is confusing. It fails to indicate what jurors were struck for cause, and it does not reflect the final composition of Smith's jury.
As this Court stated in Boyd v. State, 715 So.2d 825, 836 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998):
"In his appellate brief, the appellant argues that a prima facie case of gender discrimination exists because the prosecutor used 10 of his 14 peremptory strikes to remove 10 of 26 female jurors. However, a review of the strike list included in the record, as well as the voir dire examination, indicates that the appellant used 10 of his 13 strikes to remove female jurors. There were no supporting circumstances to indicate gender discrimination or to render a failure by the trial court to find the existence of a prima facie case of gender discrimination plain error, i.e., error that would adversely affect the substantial rights of the appellant. Similarly, in George v. State, 717 So.2d 827 (Ala.Cr. App.1996), rev'd on other grounds, 717 So.2d 844 (Ala.1996) this Court found that the record did not supply an inference of gender discrimination. `Before the plain error analysis can come into play in a Batson issue, the record must supply an inference that the prosecution engaged in purposeful discrimination. Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Rieber [v. State, 663 So.2d 985 (Ala.Cr.App.1994), affirmed, 663 So.2d 999 (Ala.1995) ].' Pace v. State, 714 So.2d 316 (Ala.Cr.App. 1995)."
The record fails to raise an inference of racial discrimination. We refuse to find error based on this inadequate record.

V.
Smith argues that the trial judge erred in failing to sua sponte recuse himself from hearing Smith's case. Specifically, he contends that there was an appearance of impropriety because the trial judge, Judge Chris Galanos, had prosecuted Smith for two counts of receiving stolen property and for third-degree burglary when Judge Galanos was district attorney for Mobile County.
Initially, we observe that there was no motion to recuse filed in the trial court. Therefore, our review of this issue is limited to determining whether plain error was present. Rule 45A, Ala.R.App.P.
Our review of the record reflects that in 1990, eight years before Smith's trial for capital murder, Smith pleaded guilty to receiving stolen property and to burglary in the third degree while Judge Galanos was the district attorney for Mobile County.
Smith contends that Judge Galanos should have recused himself from hearing this present case against Smith because, he argues, there was an appearance of impropriety sufficient to require Judge Galanos to recuse himself under Canon 3(C)(1), Alabama Canons of Judicial Ethics.
*804 We have previously addressed this issue in James v. State, 423 So.2d 339 (Ala.Cr. App.1982), and stated: "It was held in Ray v. State, 398 So.2d [774 at] 776-777 [(Ala.Cr.App.1981) ], that the fact that the trial judge, before he was a judge and while he was district attorney of the particular circuit, had prosecuted the defendant in another case presented no valid ground for a motion that he recuse himself." See also Payne v. State, 48 Ala.App. 401, 265 So.2d 185 (1972), cert. denied, 288 Ala. 748, 265 So.2d 192 (1972), cert. denied, 409 U.S. 1079, 93 S.Ct. 703, 34 L.Ed.2d 669 (1972).
Other courts have reached this same conclusion. See Jarrell v. Balkcom, 735 F.2d 1242 (11th Cir.1984), cert. denied, 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985) ("The mere fact that a judge acted as prosecutor in an unrelated case is insufficient to constitute reversible error."); Goodspeed v. Beto, 341 F.2d 908 (5th Cir. 1965), cert. denied, 386 U.S. 926, 87 S.Ct. 867, 17 L.Ed.2d 798 (1967) ("[T]he judge who presided was a former district attorney who had prosecuted the petitioner for different crimes. That was not sufficient ground for the disqualification of the judge."); Hathorne v. State, 459 S.W.2d 826, 829 (Tex.Crim.App.1970), cert. denied, 402 U.S. 914, 91 S.Ct. 1398, 28 L.Ed.2d 657 (1971) ("It is of course well settled that the mere fact that the trial judge personally prosecuted the (defendant) in past crimes does not disqualify him from presiding over a trial where a new offense is charged.'"); Thomas v. Workmen's Compensation Appeal Board, 680 A.2d 24 (Pa. Commw.Ct.1996) (Because judge previously prosecuted defendant does not preclude judge in future unrelated cases from presiding over trial.).

VI.
Smith argues that he was denied a fair trial because the trial court failed to admonish the jurors, every time that they left the courtroom, not to discuss the case with anyone and to avoid exposure to any outside contact concerning the case. He cites Rule 19.3(d), Ala.R.Crim.P., in support of this contention.
Initially, we note that there was no objection to the court's failure to admonish the jury every time that the jurors left the courtroom. Thus, our review is limited to determining whether plain error occurred. Rule 45A, Ala.R.App.P.
Rule 19.3(d), Ala.R.Crim.P., states:
"(d) Admonitions to Jurors. In all cases, the court shall admonish the jurors that they are not:
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberation;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion on the case until it is submitted to them for deliberation.
"If the jurors are permitted to separate, they may also be admonished not to view the place where the offense allegedly was committed."
Smith argues that at each break on the first day of trial, the trial court failed to so admonish the jury.
The jury in this case was sequestered. At the first break on the first day of jury selection the trial court instructed the venire that the members were not to discuss the case with anyone. (R. 61.) After Smith's jury was sworn, the trial court gave the jurors detailed instructions on *805 their obligations. The court's instructions, in part, stated:
"The Court: ... And the reason for that is pretty simple. That is, that your verdict, whatever it is, must be based exclusively on what is seen and heard in this courtroom and cannot even appear to be influenced by any outside source, which was why earlier today I twice said, please, don't talk about this case nor allow anyone to talk about it with you.
"All right. So, obviously, rule one from this point forward is no exposure in any way, shape or form to any local media for fear that you might hear or see something about this case. Rule number two is that you shall not talk about this case with anyone, nor allow anyone to talk about it with you until 12 of you retire to that room right behind you and actually start to deliberate a verdict. And the reason for that is also simple. You're going to hear this case in bits and pieces. And both as a matter of law and as a matter of conscience you shouldn't even begin to make up your mind or share your opinions until you've got all the pieces put together."
(R. 119-20.)
The trial court did not give similar detailed instructions at each break in the court proceedings. To require a court to do so would be unduly burdensome, disruptive, and contrary to the clear wording of Rule 19.3(d). Indeed, Rule 19.3(d) does not require that a trial court give the admonitions at each court break. Indeed, Rule 19.3(d) does not state that these instructions must be given more than once in the trial. The record clearly reflects that the jurors were aware of their duties and obligations. There was no violation of Rule 19.3(d).

VII.
Smith argues that his statements to police should have been suppressed because, he says, they were illegally obtained. He cites several different grounds in support of this contention.

A.
Smith argues that the police did not have probable cause to arrest him without a warrant; therefore, he says, the statements he made to the police should have been suppressed because they were "fruits of the poisonous tree." Wong v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
This Court has stated the following about arresting an accused without a warrant:
"Section 15-10-3(3), Ala.Code 1975, provides that an officer may arrest someone without a warrant when he has reasonable cause to believe that the person arrested committed a felony. `"Reasonable cause is equated with probable cause."` Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995). `Probable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.' Sockwell, 675 So.2d at 13.
"`Probable cause to arrest exists when, at the time the magistrate issues the warrant or the officer makes the arrest, there are reasonably trustworthy facts and circumstances sufficient, given the totality of the circumstances, to lead a reasonable person to believe there is a fair probability that the suspect is committing or has committed an offense.'
"Swain v. State, 504 So.2d 347 (Ala.Cr. App.1986), citing Fifteenth Annual Review of Criminal Procedure; United *806 States Supreme Court and Courts of Appeal 1984-1985, 74 Geo. L.J. 499, 518 (1986). As concerns probable cause, we note that the Alabama Supreme Court has held:
"`Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act...." "`The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest." The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause.'
"Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted)."
Smith v. State, 727 So.2d 147, 156-57 (Ala. Cr.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999). See also Melson v. State, 775 So.2d 857 (Ala.Cr.App.1999).
Here, a suppression hearing was held to determine whether Smith's statements were voluntary.[4] After the officers discussed the circumstances surrounding Smith's statements, defense counsel argued that the statements were illegal because there was no probable cause to arrest Smith. Another hearing was held on this issue. Detective Sgt. Mike Reynolds of the Mobile County Sheriff's Office testified that as a result of information that he received that a juvenile, M.A., was telling people that Smith and Reid had been involved in a robbery-murder, he went to the Highway Host motel to talk with M.A. M.A. told police that she had seen Smith, Reid, and an unknown white male in a red truck on the day of the robbery-murder. When Smith and Reid returned to the motel, M.A. told police, Smith had blood on his jeans, and he told her that he and Reid had robbed, and had beaten Van Dam, and had left his body in the woods. Reynolds testified that M.A. told him:
"[Smith] told her how he had taken the gentleman to a wooded area near the `party hole,' is what she called it, off Shipyard Road, how they had robbed him, how they had beat him, also how they had gotten the truck stuck and that when they left him they left him beneath a mattress. Also, that they had at some point placed an `x' on his back."
(R. 187.) M.A. also told Reynolds that Smith showed her a Tennessee driver's license that he said was the victim's. Reynolds stated that police then talked with Reid, who was staying at the Highway Host motel at the time of the murder. *807 Reid told police that he had been with Smith and Van Dam but that he had gotten them to drop him off. Reid also went with police to where M.A. said the body was located. Reid told police that the body was in the opposite direction from where it was eventually found. Police did not discover the body when they were with Reid. They took Reid back to the motel and went back to the area, where they discovered Van Dam's body in his truck. A bloody mattress was located near the truck. Reynolds also stated that much of the information M.A. had given them was corroborated by the murder scene. After talking with Reid and M.A., police proceeded to Smith's house to take him into custody. Certainly, there was more than sufficient probable cause to believe that Smith was involved in the robbery-murder.

B.
Smith further argues that he was illegally arrested at his home without a warrant in violation of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).
We note that the circumstances surrounding Smith's arrest were not totally developed in the record because Smith did not attack his arrest on this ground at trial. We are thus confined to a plainerror analysis. Rule 45A, Ala.R.App.P. We have stated about reviewing the validity of an arrest that "`[t]he defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which the error is predicated ever occurred.'" Smith v. State, 588 So.2d 561 (Ala.Cr.App. 1991), on remand, 620 So.2d 727 (Ala.Cr. App.1992), quoting Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
Here, Sgt. Patrick Pyle of the Mobile County Sheriff's Office testified that Smith was arrested at his mother's trailer, which was located in a trailer park off Old Pascagoula Road in Mobile. There is no evidence in the record concerning who was present at the time of Smith's arrest. However, Pyle testified that he went to Smith's mother's trailer several different times that day. He said that she gave them permission to search the trailer and that she signed two permission to search forms. These forms are contained in the record. (Supp. R. 446-47.) There is absolutely no evidence in the record that the police forced their way into Smith's mother's house to arrest him.
As this Court stated in Smith:
"[T]here is no merit to Smith's argument that the entry into his home to make the arrest violated Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Payton concerned a warrantless and a nonconsensual entry into a suspect's home to make a routine felony arrest. There is no evidence here that the officers' entry into Smith's mother's trailer (where Smith was staying) was without consent. (R. 1127.) As the state pointed out in its brief to this court, `"the consent necessary in the Payton context is consent to enter, not consent to arrest.'" quoting Fortenberry v. State, 545 So.2d 129, 137 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), quoting in turn United States v. Briley, 726 F.2d 1301 (8th Cir.1984)."
727 So.2d at 157-58.
Moreover, officers could have legally entered Smith's mother's trailer and arrested Smith without a warrant if there was probable cause to arrest and exigent circumstances. We have already determined that there was probable cause to arrest Smith. Thus, we are left to determine whether exigent circumstances existed for his immediate arrest without first obtaining a warrant. As this Court stated in Borden v. State, 769 So.2d 935 (Ala.Cr. App.1997):
"In Bush [v. State], 523 So.2d 538 [(Ala.Cr.App.1988) ], this court set forth the following as factors that may indicate *808 the existence of exigent circumstances:
"`(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public; and (6) the peaceful circumstances of the entry.'
"523 So.2d at 546, citing United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir.), cert. denied, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987). See Dorman v. United States, 140 U.S.App. D.C. 313, 435 F.2d 385, 392-93 (D.C.Cir. 1970); 3 W.LaFave, Search and Seizure § 6.1(f)(3d ed.1996). Virtually all of the factors described in Bush were present in the instant case. `[T]he gravity of the underlying offense was of the highest nature. The defendant had committed an offense for which the death penalty was authorized.' Musgrove [v. State], 519 So.2d [565] at 573 [ (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988) ]. Law enforcement officers had reason to believe that the appellant would be armed, in view of the fact that they had information that he had stabbed Ledbetter to death approximately 13 hours earlier. There was probable cause to believe that the appellant had committed the crime, including the statements of eyewitnesses. The officers had reason to believe that the appellant was inside the apartment where his automobile was parked outside and that his probable state of mind made it likely that further delay could allow the appellant to flee or could jeopardize the safety of the woman known to reside in the apartment. Additionally, there is evidence that the arrest was made without the use of force: the officers first attempted to effect entry by knocking and announcing themselves, and after their entry, the appellant was cooperative, even signing a consent-to-search form. Accordingly, even if the appellant's arrest was unauthorized under the warrant (and we emphatically do not so hold), it was justified on the ground of probable cause and exigent circumstances."
We believe that there were exigent circumstances present here to uphold the entry into Smith's mother's trailer to arrest him without a warrant.
Based on the record before us, we hold that Smith's arrest was not illegal.

C.
Smith also argues that the statements he made to the police should have been suppressed because, he says, they were involuntary, i.e., given as a result of police coercion and involuntary because, he says, the Miranda[5] warnings were not given.
A confession is presumed involuntary and it is the State's burden to prove by a preponderance of the evidence that Miranda warnings were given and that the accused voluntarily waived his Miranda rights. Coral v. State, 628 So.2d 954 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Lewis v. State, 535 So.2d 228 (Ala. Cr.App.1988). In determining whether a statement is voluntary, a reviewing court must look at the "totality of the circumstances" surrounding the confession. *809 McLeod v. State, 718 So.2d 727, 729 (Ala.), on remand, 718 So.2d 731 (Ala.Cr.App.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). "When determining the admissibility of a confession, this Court must look at the entire circumstances, not only the behavior of the interrogators in creating pressure, but also the defendant's experience with the criminal justice system and personal characteristics." Craig v. State, 719 So.2d 274, 278 (Ala.Cr.App.1998).
Here, Smith gave two statements to police. Detective Donald Lunceford of the Mobile County Sheriffs Office testified that he and another officer went to Smith's mother's trailer on November 27, 1997, at around noon to arrest Smith. Lunceford said that Smith was read his Miranda rights at the moment he was taken into custody and again after he was transported to the criminal investigation division office in Theodore. Detective Reynolds stated that he talked with the appellant at around 5:00 p.m. that same day and that he did not give him Miranda warnings again because when he entered the interview room he saw a Miranda form. He said that Detective Lunceford told him that Smith had already been informed of his Miranda rights. Also, Smith was in police custody from the time that he was arrested, around 12:00 p.m., until he made his first statement, at approximately 5:00 p.m. the same day. There was a lapse of approximately five hours from his arrest to the first statement. Reynolds and Lunceford both testified that Smith was made no promises or offered any inducements to testify. Both also testified that Smith was not coerced in order to get a statement from him. Reynolds said that he told Smith that he had been implicated in the robbery-murder of Van Dam. Reynolds testified that Smith was in Detective Lunceford's and Detective Pyle's presence until he was turned over to him. (R. 440.)[6] Reynolds also stated that no one had access to Smith after Lunceford and Pyle relinquished him to Reynolds. (R. 445.) Smith gave a second statement at 8:00 p.m. on the same day. He was read his Miranda before making this statement and he signed a waiver of rights form.

1.
Smith initially argues that his statements were involuntary because his IQ is low.
Initially, we note that this was not a reason given for suppressing Smith's statement. (R. 179.) Thus, our review is limited to a plain-error analysis. Rule 45A, Ala.R.App.P.
We observe that when the suppression motion was made, the trial court had no knowledge of Smith's IQ. The only evidence of Smith's IQ is contained in the penalty phase of the proceedings. At the time of the motion to suppress nothing in the record reflected Smith's IQ.
In this case, Detective Lunceford testified that, when he made his statements, Smith did not appear to be under the influence of drugs or alcohol, and that he was lucid, coherent, and aware of his circumstances. He asked Smith if he could read and write and whether he understood the English language; he indicated that he could and he did. Smith then signed the acknowledgement-of-rights form and he appeared to understand his rights. Also, *810 Smith had had prior involvement with the police and the criminal justice system. Detective Reynolds verified what Lunceford had testified to.
Mental subnormality is but one factor to consider when reviewing the totality of the circumstances surrounding a confession, Harkey v. State, 549 So.2d 631 (Ala.Cr.App.1989); Lewis v. State, 535 So.2d 228 (Ala.Cr.App.1988); Whittle v. State, 518 So.2d 793 (Ala.Cr.App.1987); Sasser v. State, 497 So.2d 1131 (Ala.Cr. App.1986), and will not alone render a confession involuntary. Flynn v. State, 745 So.2d 295 (Ala.Cr.App.1999).
Here, "[e]ven considering evidence of the defendant's mental subnormality[,] which was not before the trial judge when he ruled on the admissibility of the statements, the defense testimony `does not show that [the defendant] was so mentally deficient that he was incapable of being able to make a knowing and intelligent waiver.'" Whittle v. State, 518 So.2d at 797, quoting Sasser, 497 So.2d at 1134.

2.
Smith argues that his statement was involuntary because before his first statement he was not again read his Miranda rights. We do not agree.
The record shows that Smith was given his Miranda rights on two separate occasions within five hours of making his first statement to Reynolds. This Court has frequently stated:
"`It should be made clear that once Miranda's mandate was complied with... it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by Miranda.'"
Jones v. State, 47 Ala.App. 568, 258 So.2d 910 (Ala.Cr.App.1972). See also McBee v. State, 50 Ala.App. 622, 282 So.2d 62 (1973); Allen v. State, 53 Ala.App. 66, 297 So.2d 391 (1974), cert. denied, 292 Ala. 707, 297 So.2d 399 (Ala.1974). See also Anderson v. State, 339 So.2d 166 (Ala.Cr.App.1976) (Miranda warnings given the night before when defendant was arrested; it was not necessary to give Miranda warnings again).
We have also stated:
"In Hollander v. State, 418 So.2d 970, 972 (Ala.Cr.App.1982), this court stated:
"`It is well settled that once Miranda warnings have been given and a waiver made, a failure to repeat the warnings before subsequent interrogation will not automatically preclude the admission of an inculpatory response. Fagan v. State, 412 So.2d 1282 (Ala.Crim.App.1982); Smoot v. State, 383 So.2d 605 (Ala.Crim.App. 1980). Whether the Miranda warnings must be repeated depends on the facts of each individual case, with the lapse of time and the events which occur between interrogation being relevant factors to consider. Fagan v. State, supra; Jones v. State, 47 Ala. App. 568, 258 So.2d 910 (1972).'"
Cleckler v. State, 570 So.2d 796, 803 (Ala. Cr.App.1990).
Here, when Smith gave the first statement at approximately 5:00 p.m. he told police that he had nothing to do with the robbery-murder and that Reid had beaten and robbed Van Dam. This first statement was an exculpatory statement that did not implicate Smith in the robbery-murder. Only five hours had passed since he was taken into custody and Smith had been in Pyle's and Lunceford's custody during this time. The second statement was taken at approximately 8:00 p.m. the same day. Reynolds testified that before Smith made *811 this second statementin which he admitted that he had hit, and had kicked Van Dam, and had thrown a handsaw at Van Dam, and had held Van Dam down while Reid took his moneyhe read Smith his Miranda rights and Smith signed a waiver of rights form. This wavier is in the record. (Supp. R. 449.) It is undisputed that Smith was given his Miranda rights before he made his second inculpatory statement.[7] No violation of Miranda occurred here.

3.
Smith argues that his statement was involuntary because, he says, police coerced him into making the statement by telling him that Reid had implicated him in the robbery-murder.
Initially, we observe that there was no objection on this basis at the suppression hearing. Our review is limited to plain error. Rule 45A, Ala.R.App.P.
We have stated that telling a suspect that he has been implicated in a crime is not coercive. C.C. v. State, 586 So.2d 1018 (Ala.Cr.App.), on remand, 591 So.2d 156 (Ala.Cr.App.1991). "Confronting a defendant with evidence of guilt is not coercion on the part of police and does not render a subsequent confession involuntary." Jackson v. State, 562 So.2d 1373, 1382 (Ala.Cr.App.1990).

VIII.
Smith argues that the trial court committed reversible error when it asked the coroner about the number of distinct wounds that she had counted on Van Dam's body. He contends that this information was relevant only to the penalty phase issueto the question whether the crime was especially heinous, atrocious, or crueland was highly inflammatory at the guilt phase of the proceedings.
At the end of Dr. Goodin's testimony the following occurred:
"The Court: Doctor, if I may, in the course of your autopsy, how many separate and distinct injuries were you able to document?
"Mr. Byrd [defense counsel]: Your, Honor, I would respectfully object to that as being a little bit too vague. I would ask it be limited to certain and distinct injuries caused by some force inflicted by a human being, not say indefinite as to all the different injuries.
"The Court: I will rephrase the question at your request.
"Mr. Byrd: Thank you, sir.
"The Court: If there has been testimony in this case that Mr. Van Dam was beaten, was assaulted with a saw and struck with certain tools, can you tell us *812 how many separate and distinct injuries your external examination documented?
"Mr. Byrd: Before we receive an answer, Your Honor, may we approach?
"The Court: Yes.
"(At the sidebar:)
"The Court: Okay. What's on your mind?
"Mr. Byrd: Judge, with regards to the Court's question we would submit that by asking questions of fact from this particular witness and that particular question would be helping the State with [its] case and the question is vague, Your Honor.
"The Court: First of all, let me bring to your attention Rule 614 of the Alabama Rules of Evidence which gives the Court permission not only to question but to interrogate. All right. Secondly, there has been some caselaw most recently K-Mart Corporation & Ray Jones v. Joyce Kyles, [723 So.2d 572 (Ala.1998) ] where this issue was raised. And the Court ofexcuse me. The Alabama Supreme Court affirmed the right of the judge to ask questions."
(R. 626-27.)
The above quote from the record clearly shows that Smith did not object to this question at trial on the basis he now raises on appeal. Thus, we are limited to a plain-error analysis. Rule 45A, Ala.R.App.P.
As the trial court stated above, a trial judge has the right to ask questions of a witness. That right is provided in Rule 614(b), Ala.R.Evid. and has been recognized in the case cited by the judge, K-Mart Corp. v. Kyles, 723 So.2d 572 (Ala. 1998). The trial court had the right to ask the coroner this question. However, Smith argues on appeal that the answer to the question was relevant only to a penalty-phase issuewhether the crime was especially heinous, atrocious, or cruel, as compared to other capital cases.
Dr. Goodin testified that there were 35 different injuries on Van Dam's body. We fail to see how the coroner's testimony could possibly have risen to the level of plain error based on the record before us. Dr. Goodin, before this question had been asked, testified in depth concerning the different and distinct injuries suffered by the victim and the fact that the victim did not die a slow death. Also, the jury was shown photographs of the victim's body and had firsthand knowledge of the different injuries. Furthermore, in both of Smith's statements he told police that Van Dam was beaten repeatedly. There is absolutely no question that Van Dam suffered numerous and severe injuries. We are confident that the trial court's conduct here did not amount to error, much less plain error.

IX.
Smith argues that the admission of what he alleges is hearsay evidence amounts to reversible error. He cites several different places in the record in support of this contention.

A.
Smith argues, citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968),[8] that it was reversible error to allow hearsay testimony during Russell Harmon's testimony concerning what Reid had told him about the robbery-murder. *813 During Harmon's testimony the following occurred:
"Q [by prosecutor]: Russell, was there any conversation about any money from the dead man?
"A: They had said that they had got that they had
"Mr. Hughes [defense counsel]: Your Honor, it if please the Court, I would object to `they,' that he state specifically who said what.
"The Court: That's fair. Can you tell us who said what about the money, if anything was said about the money?
"A: Yes, sir. Larry and then Jody was mainly agreeing with Larry. Jody did not come right out and say anything about the money, no."
(R. 343-44.)
Initially, we observe that in the above exchange defense counsel not only did not object to the elicited testimony but asked that the witness identify who had made the statement. Counsel acquiesced to the admission of this testimony and cannot now complain on appeal that any error occurred. "A party may not predicate an argument for reversal on `invited error,' that is, `error into which he has led or lulled the trial court.'" Atkins v. Lee, 603 So.2d 937 (Ala.1992). We have applied the invited-error rule to capital cases. Ex parte Bankhead, 585 So.2d 112, 126 (Ala.), on remand, 585 So.2d 133 (Ala. Cr.App.1991), after remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.), on remand, 625 So.2d 1149 (Ala.Cr.App.1993). "`An invited error is waived, unless it rises to the level of plain error.'" Perkins v. State, [Ms. CR-93-1931, November 19, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999), quoting Bankhead, 585 So.2d at 126.
Here, there is no question that the above-quoted exchange did not rise to the level of plain error. The information elicited from this witness had been volunteered by Smith in his statement to police. Smith said that he held Van Dam down while Reid took the money out of his pockets.
Smith also objects to the following testimony:
"Q [defense counsel]: Can you recall exactly what Jody said and can you recall exactly what Larry said?
"A [Harmon]: No, ma'am. No, ma'am.
"Q: Any [reason] why can't you separate them?
"A: Well, because it was a year ago and I don't sit and dwell onI mean, I don't sit and think about it.
"Q: Other than that the guy was left for dead, were you told anything else about his condition?
"A: No ma'am, just beat bad. He was just beat bad.
"Q: And who told you something about a mattress, do you recall who that was?
"A: I thinkI'm not for sure, but I think Larry did.
"Mr. Hughes: Well, that answers the question. If he's not for sure he's just speculating and guessing and we would object to it.
"The Court: It's sustained. You could lay a predicate, though, I mean.
"Q: Do you recall who said anything about a mattress?
"A: I believe it was Larry."
(R. 345-46.)
Initially, we note that counsel did not raise the same objection to the testimony at trial that he now raises on direct appeal. We are therefore limited to a plain-error analysis. Rule 45A, Ala.R.App.P.
Smith argues that the above exchange resulted in the admission into evidence of hearsay about Reid's out-of-court statements implicating Smith. Our reading of the exchange does not reveal that the testimony suggests that Reid implicated *814 anyone but himself. Also, this same information was contained in Smith's statements to police. "`Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.'" McCorvey v. State, 642 So.2d 1351, 1354 (Ala.Cr.App. 1992), quoting Thompson v. State, 527 So.2d 777, 780 (Ala.Cr.App.1988). See also Ex parte Bush, 474 So.2d 168 (Ala.1985); Parker v. State, 587 So.2d 1072 (Ala.Cr. App.1991), on remand, 610 So.2d 1171 (Ala. Cr.App.), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993); Gulledge v. State, 526 So.2d 654 (Ala.Cr.App.1988).

B.
Smith argues that the trial court erred in allowing Sgt. Pyle to testify about what Smith's mother told him. The following occurred during Pyle's testimony:
"Q [prosecutor]: And what did you search the housewhat areas of the house did you look in?
"A: We searched the area that Ms. Smith indicated was the Defendant's bedroom area and we looked in the washing machine.
"Q: And where was the washing machine located?
"A: It wasif you walk in you're in a living room with a kitchen to the left and a small hallway. The washer and dryer were in that small hallway.
"Q: And were the washerwas the washer running?
"A: Yes, ma'am, it was in alike a spin cycle.
"Q: And what made you search the washing machine?
"A: Well, we were looking, from what we had learned form the people we had talked to earlier, for some clothes and when we got to the house, Lunceford and myself, we were talking to Ms. Smith about where Jody [Smith] had been, what he had been doing. I could hear the washer running and I asked her was she washing any amount of clothes in there and she said no, Jody was.
"Q: And because of that did you make any immediate request of Ms. Smith?
"A: I asked her if she would mind stopping that washer right away.
"Q: And did she stop the washing machine?
"A: Yes, ma'am."
(R. 408-09.) Smith contends that Pyle's testimony that Smith's mother told him that Smith was washing clothes was hearsay, was highly prejudicial, and resulted in his being denied his right to confrontation.
There was no objection to the admission of this testimony; thus, we apply a plain-error review. Rule 45A, Ala.R.App.P.
A review of the above-quoted portion of the record shows that this statement was elicited to establish the reasons for the officer's action and the reasons the officers searched certain areas of the trailer. It was not offered for the truth of the matter asserted and was not hearsay. "The fact of the conversations in this case was offered to explain the officer's actions and presence at the scenenot for the truth of the matter asserted. Accordingly, it was not hearsay. Clark v. City of Montgomery, 497 So.2d 1140, 1142 (Ala.Cr.App. 1986)." Thomas v. State, 520 So.2d 223 (Ala.Cr.App.1987).
Moreover, Smith told police in his statements that he had washed the clothes he had worn during the robbery-murder. Thus, even if this evidence was hearsay, it was cumulative of other evidence that was presented though Smith's own admissions to police.

*815 "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred. McFarley v. State, 608 So.2d 430, 433 (Ala.Crim. App.1992); Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988). Mary Evans's testimony that Mary Enfinger yelled for her to get her gun from under the bed is merely cumulative of evidence that had already been elicited by the appellant's counsel. Even if Mary Evans's testimony were inadmissible hearsay, the statement was cumulative of prior evidence and any error that may have resulted was harmless."
Yeomans v. State, 641 So.2d 1269, 1272-73 (Ala.Cr.App.1993). See also Flynn v. State, 745 So.2d 295 (Ala.Cr.App.1999).

X.
Smith next argues that the trial court erred in not allowing him to cross-examine State's witness M.A. about where she was residing at the time of trial to show her bias in favor of the State. See Davis v. State, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). It is apparent from the record that Smith sought to elicit that M.A. had been adjudicated a juvenile offender and that at the time of trial she was in the custody of juvenile correctional authorities because her probation had been revoked. The following occurred during her testimony:
"Q [defense counsel]: [M.A.], where do you live today?
"Ms. Davis [prosecutor]: Judge, we're going to object. Can we approach?
"The Court: Sure.
"(At the sidebar:)
"Mr. Byrd [defense counsel]: Judge, she's been revoked on a drug violation.
"The Court: You can ask her if she was using drugs at the time that this occurred. That's pertinent. But as to where she's living now, I sustain the objection.
"Mr. Byrd: Well, Judge, that goes to her credibility. It is offered strictly for impeachment and would go directly to her credibility.

"The Court: Well, it mightit might affect her credibility, but the question is consistent with the Rules of Evidence, is that a proper mode of impeachment, and I don't think it is."
(R. 369) (emphasis added).
Smith argues that this evidence was admissible to establish any possible bias M.A. might have in favor of the State. This specific argument was not raised during trial and Smith made no attempt to argue that M.A. had made any deal with the State that would result in her being biased. Smith made no offer of proof that the juvenile probation revocation would be proof of bias. We have held that an offer of proof is necessary before we can review a trial court's ruling on the limitation of cross-examination. See M.T. v. State, 677 So.2d 1223 (Ala.Cr.App.1995); Myers v. State, 601 So.2d 1150 (Ala.Cr.App.1992).
Other jurisdictions have held that because of the restrictive holding of Davis, and the fact that juvenile records may not be used for impeachment of general credibility, an offer of proof is essential to preserve this issue for an appellate court. In Smith v. United States, 392 A.2d 990 (D.C.Ct.App.1978), the issue before the court was whether the lower court erred in not allowing a State's witness, who had identified the accused as the robber and had picked him out a lineup, to be cross-examined about the fact that the witness, at the time of trial, was incarcerated in a juvenile facility. The Smith Court stated:
"In the case at bar, counsel for appellant did not proffer, nor does the record indicate any reason why Mr. Thames' *816 juvenile record or place of residence would make his testimony partial or biased. Hence, the proffered cross-examination here was intended simply as a general impeachment of the witness' credibility.
"There is an inherent difference between cross-examination intended as a general attack on the credibility of a witness and cross-examination directed toward revealing possible bias, prejudices, or ulterior motives of a witness. See Davis v. Alaska, [415 U.S. 308,] 316, 94 S.Ct. 1105 [, 39 L.Ed.2d 347 (1974)]; Springer v. United States, [388 A.2d 846] at 855 [ (D.C.1978) ]; Gillespie v. United States, D.C.App., 368 A.2d 1136, 1137 (1977).
"`[B]ias is always a proper subject of cross-examination.' Hyman v. United States, D.C.App., 342 A.2d 43, 44 (1975). And, the curtailment of such cross-examination by a trial court must be reviewed in terms of whether it is constitutional error. See Davis v. Alaska, supra 415 U.S. at 318, 94 S.Ct. 1105; Brookhart v. Janis, supra 384 U.S. at 3, 86 S.Ct. 1245; Springer v. United States, supra at 856; Gillespie v. United States, supra at 1138. However, the Constitution does not confer a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions. Davis v. Alaska, supra 415 U.S. at 321, 94 S.Ct. 1105 (Stewart, J., concurring). In fact, in the context of impeachment of general credibility, evidence of a prior conviction usually is inadmissible if the conviction resulted from a juvenile adjudication. See Brown v. United States, supra[, 119 U.S.App.D.C. 203, 338 F.2d 543 (1964)]. See also Fed.R.Evid. 609(d); United States v. Decker, 543 F.2d 1102, 1104-05 (5th Cir.1976), cert. denied sub nom. Vice v. United States, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977); United States v. Lind, 542 F.2d 598, 599 (2d Cir.1976), cert. denied, 430 U.S. 947, 97 S.Ct. 1585, 51 L.Ed.2d 796 (1977). Hence, we conclude that the trial court's restriction of the impeachment of Mr. Thames' general credibility by cross-examination regarding his juvenile record was not inconsistent with the Sixth Amendment's confrontation clause.
". . . .
"We are not convinced on the record of this case, that trial court abused its discretion. We cannot perceive that such impeachment might have affected the outcome."
392 A.2d at 992-93. See also State v. Wilson, 16 Wash.App. 434, 557 P.2d 18, 21 (1976), review denied, 88 Wash.2d 1015 (1977) ("If it was the purpose of defense counsel to impeach the testimony of Thomas by demonstrating his bias within the rule of Davis, it was incumbent upon him to make this purpose known to the trial court in his offer of proof."); Bellinder v. State, 69 Wis.2d 499, 230 N.W.2d 770 (1975) ("The problem created by an inadequate record is particularly apparent in this case because of the limited factual applicability of Davis v. Alaska, supra.").
The above-quoted portion of the record reflects that defense counsel sought to elicit this testimony for the purpose of attacking M.A.'s credibilitynot to show any bias that M.A. had in favor of the State. This conclusion is supported by the record. Before trial Smith filed a motion styled as a "Motion to Compel Disclosure of Existence and Substance of Promises of Immunity, Leniency, or Preferential Treatment." (R. 143.) This motion requested the State to disclose any deals that it had made with any State witnesses. This motion was granted, and at a pretrial hearing the following occurred:
"The Court: ... Mr. Brandyburg [prosecutor], do you know if anyone would be *817 testifying in this case pursuant to any sort of a bargain with the district attorney?
"Mr. Brandyburg: Judge, based on the information and belief, to this point there are no agreements. The State is aware of its obligations to reveal any agreements, as such, as they arise, and I'm sure Ms. Davis [prosecutor] will do that. At this point, no, sir, there are none.
". . . .
"Ms. Davis: Your Honor, for the record, there have been no agreements with any parties in this case."
(R. 4-10.) The record clearly shows that M.A. was not offered any reward from the State in exchange for her testimony at Smith's trial.
Based on the application of the above principles of law, our review of this issue is limited to a plain-error analysis. Rule 45A, Ala.R.App.P. However, we emphasize that our affirmance of this issue is not dependent on application of the plain-error doctrine. The trial court's ruling was not error, much less, plain error.
Smith argues, citing the United States Supreme Court's opinion in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), that he was denied his Sixth Amendment rights of confrontation on cross-examination when the trial court sustained the State's objection to the question concerning M.A.'s residence. In Davis, the state's key witness, a juvenile, identified the defendant as the man he had seen on a road near his family's house at the point where a stolen safe was later discovered. At the time of the defendant's trial and at the time of the events the witness testified to, the witness was on probation, having been adjudicated a delinquent for two burglaries. The defendant argued that he should have been allowed to reveal to jurors the witness's status as a juvenile probationer to show that the witness had made a faulty identification of the defendant in an effort to shift attention away from himself as a suspect in the crime and because he "might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation." 415 U.S. at 311, 94 S.Ct. 1105. The trial court granted the state's motion to keep the witness's juvenile records secret. The Supreme Court, reversing the trial court's judgment, held that the defendant was entitled to introduce the witness's juvenile record to support an inference that the witness was biased because of his "vulnerable status as a probationer," Davis, 415 U.S. at 318-19, 94 S.Ct. 1105, and that the exclusion of this evidence violated the defendants right of confrontation and cross-examination.
Davis, however, does not stand for the proposition that a juvenile witness can be cross-examined as to prior juvenile adjudications for impeachment purposes; it stands for the proposition that such rights of cross-examination are for the purpose of showing bias or prejudices under the guidelines therein set forth. The defendant in Davis made it clear that he would not introduce the witness's juvenile adjudication for purposes of general impeachment of his character as a truthful person but, rather, to show the bias and prejudice of the witness. Here, however, Smith's counsel argued only that M.A.'s probation revocation "goes to her credibility. It is offered strictly for impeachment and would go directly to her credibility." On appeal, in an effort to bring himself within Davis, Smith suggests that his trial counsel was attempting to bring out matters that would have shown that M.A., because she was presumably under the control of juvenile authorities, was induced by bias to give testimony for the State. However, counsel for Smith did not proffer, nor does the record indicate any reason why, M.A.'s juvenile record or place of residence would *818 make her testimony partial or biased in favor of the State. In fact the record supports the conclusion that the State had no agreement with M.A. in exchange for her testimony.
This case is distinguishable from the holding in Davis for several very significant and distinct reasons, and we believe that the facts of this case do not fall under the restrictive holding of Davis. Unlike the juvenile in Davis, M.A.'s probation had already been revoked. Any conceivable help she could have expected from the State would be speculative at best and not supported by the record in this case. M.A. had no state action pending against her and was not in the "vulnerable status [of] a probationer." Davis, 415 U.S. at 318-19, 94 S.Ct. 1105. Also, one major distinction not present in this case, that was noted in Davis, is that the juvenile in Davis was an "crucial" eyewitness to the accused's presence near the scene of the crime when it occurred and possibly a suspect in the crime. The Davis court noted, "serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry." Davis, 415 U.S. at 319, 94 S.Ct. 1105. Here, every material aspect of M.A.'s testimony was either corroborated by other witnesses or corroborated by Smith's confession. Most significant is the fact that M.A. was not a suspect in the case and was not Smith's accomplice in the robbery-murder.
We find support for this holding in Alabama law. Recognizing the competing interests of protecting the anonymity of juvenile offenders versus the right of an accused to confront the witnesses against him, Alabama has limited the Supreme Court's holding in Davis, by holding that, although juvenile records may properly be used to show a witness's bias, the use of juvenile records for purposes of general impeachment is disallowed. Rule 609, Ala. R.Evid., addresses the admissibility of prior convictions to impeach a witness. Rule 609(d), states: "Evidence of juvenile or youthful offender adjudications is not admissible under this rule." Also, § 12-15-72(a)(b), Ala.Code 1975, provides that a juvenile adjudication is not a conviction and is not admissible against a juvenile in any court. Further, Alabama caselaw has consistently distinguished the restrictive holding in Davis. See Ex parte Lynn, 477 So.2d 1385 (Ala.1985), on remand, 477 So.2d 1388 (Ala.Cr.App.1985), after remand, 543 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989) (case reversed because the defendant was not allowed to cross-examine accomplice about his plea bargain with the state in exchange for his testimony against his accomplice; the Court noted that there is a difference between general impeachment of a juvenile witness and attacking the witness's credibility because of bias); Ex parte McCorvey, 686 So.2d 425 (Ala.), on remand, 686 So.2d 426 (Ala.Cr. App.1996) (Supreme Court held that there was no error in limiting the cross-examination of defendant about his probationary status as youthful offender); Rowell v. State, 647 So.2d 67 (Ala.Cr.App.1994); Kirby v. State, 581 So.2d 1136 (Ala.Cr.App. 1990), (Davis is "`carefully limited and [was] not intended to mandate a sweeping constitutional intrusion into state evidence law'"); Hunt v. State, 453 So.2d 1083 (Ala. Cr.App.1984), overruled on other grounds, Ex parte Marek, 556 So.2d 375 (Ala.1989) (the court declined to apply the holding in Davis because juvenile witness was no longer on probation, his probation had been terminated five years before trial); and Alderson v. State, 370 So.2d 1119 (Ala. Cr.App.1979) ("holding in Davis was limited, and was not meant to be a general license to impeach a witness by past juvenile delinquency adjudication in all situations"). *819 Cf. May v. State, 710 So.2d 1362 (Ala.Cr.App.1997) (court did not improperly deny defendant access to juvenile records because juvenile witness had no pending actions against him at the time of trial).
Even if we were to hold that Davis mandated the introduction of evidence of M.A.'s juvenile probation revocation, we believe that any possible error in its exclusion was harmless beyond a reasonable doubt based on the Supreme Court's decision in Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
Before the Supreme Court released Davis, that Court, on two occasions, examined the right of an accused to cross-examine the witnesses who testify against him. See Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), and Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). The Court in Alford, citing prior case-law, noted that "`a denial of cross-examination without waiver ... would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" 390 U.S. at 131, 88 S.Ct. 748, quoting Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).
However, in the years since Smith, Alford, and Davis, the Supreme Court has clearly eschewed a per se Confrontation Clause analysis in favor of a harmlesserror analysis. In Delaware v. Van Arsdall, the Supreme Court specifically limited its holdings in those cases and held that the denial of "the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." The Van Arsdall Court stated:
"We hold that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to a Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967),] harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."
475 U.S. at 684, 106 S.Ct. 1431.
Other states have, since the release of Van Arsdall, applied the harmless-error analysis to a trial court's curtailment of cross-examination to show bias. See People v. Nutall, 312 Ill.App.3d 620, 245 Ill. Dec. 515, 728 N.E.2d 597 (2000); State v. Roberts, 97 Wash.App. 1069 (1999); People v. Kliner, 185 Ill.2d 81, 235 Ill.Dec. 667, 705 N.E.2d 850 (1998), cert. denied, 528 U.S. 830, 120 S.Ct. 86, 145 L.Ed.2d 73 (1999); People v. Jones, 209 Mich.App. 212, 530 N.W.2d 128 (1995), appeal denied, 450 Mich. 955, 549 N.W.2d 560 (1995); State v. Davis, 256 Kan. 1, 883 P.2d 735 (1994); State v. Bowen, 254 Kan. 618, 867 P.2d 1024 (1994); State v. Howell, 868 S.W.2d 238 (Tenn.1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994).
An application of the principles set out in Van Arsdall more than supports a finding of harmless error. The most damaging *820 evidence that M.A. testified to was the following:
"[Smith] said they went off drinking and that they had hit the man in the head with a 2 × 4 and struck him in the face a couple of times. They ended up pulling off in the woods, they drug him about a mile away from his vehicle and Larry had walked away when Jody struck him. JodyJody told me that he had stabbed the man in the back, cut an `x' in his back, hit him in the knees with a hammer so he couldn't' walk and sliced his throat with a handsaw."
(R. 361.) Smith himself told police in his confession that he kicked Van Dam in the ribs several times,[9] hit him on the head with his fist, probably hit him with a hammer but he could not actually remember because he suffered from blackouts, threw a handsaw at him, and held him down while Reid took the money from his pockets. He said that the two then left Van Dam's body under a mattress after Smith suggested that they put Van Dam's body in a nearby lake. Smith's own words reflect that he aided and abetted Reid in the robbery-murder and most likely, based on the coroner's testimony and on Smith's statements, struck the fatal blows when he kicked Van Dam in the ribs.
Smith's own words and actions indicate his intent to rob and to kill Van Dam. Smith tried initially to put the blame on Reid; he then admitted that he and Reid intended to rob Van Dam. Smith suggested that the two put the body in a nearby lake, and Smith said that he was mad at Van Dam and that he kicked him. Smith indicated that he knew he had messed up because he had just been released from prison two days before the murder, and Smith said that he held Van Dam down while Reid went through his pockets and got his money. Even if Smith did not actually strike the fatal blow, he is not excused from liability for the robbery-murder under Alabama law. We have held: "As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or guilt." Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
Also, Russell Harmon corroborated M.A.'s testimony and testified that Smith and Reid approached him on the day of the robbery-murder and asked if he wanted to participate in robbing Van Dam. He said that when he spoke to the two later that day they both said that they had beaten and robbed Van Dam. Harmon said that Smith told him that he had cut Van Dam with a saw. On cross-examination Harmon did say he was not absolutely sure whether Smith or Reid made this statement. However, Harmon reiterated on cross-examination that Smith told him that he had "hit the man, beat the manhit the man in the head and cut him." (R. 340.)
Other aspects of M.A.'s testimony were corroborated by police testimony concerning the crime scene and testimony that Smith had pawned the tools he had taken from Van Dam.
The record also reflects that the trial court allowed M.A. to be questioned concerning her use of drugs in 1997 and the fact that she had smoked marijuana on the day of the robbery-murder. Defense also questioned M.A. about the specifics of her *821 direct examination. Here, there was not a total denial of cross-examination.
Moreover, the most incriminating evidence offered against Smith was not M.A.'s testimony but Smith's own confession of his participation in the robbery-murder. Certainly, a confession is the most damaging and compelling evidence the State may present against an accused.[10] This is abundantly clear when reviewing the history of the Miranda decision. M.A.'s testimony was not the most "crucial" piece of evidence the State presented against Smith.
We hold that the failure to allow M.A. to be questioned about the fact that her juvenile probation had been revoked was harmless.

XI.
Smith argues, in one paragraph in his brief to this Court, that the trial court erred in allowing what he argues were cumulative and gory photographs of the victim's body to be introduced at trial because, he says, they were so prejudicial that their admission denied him a fair trial.
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr. App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala. Cr.App.1984).'
"Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Kuenzel v. State[, 577 So.2d 474 (1990)]; Ivery v. State[, 686 So.2d 495 (1996)]; C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (5th ed.1996). We have examined the photographs introduced into evidence in this case, and applying the legal principles set out above to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence at either the guilt phase or the sentencing phase of the trial."
Ingram v. State, 779 So.2d 1225, 1273 (Ala. Cr.App.1999).

*822 XII.
Smith argues that the trial court erred in denying his motion for a new trial after a State's witness testified that Smith had previously been in prison. The following occurred during the direct examination of Patricia Milbeck:
"Q: [prosecutor]: Now, at that time did you know Jody?
"A: Yes, sir, by writing him when he was in prison.
"Mr. Hughes [defense counsel]: Your Honor, I object to that."
(R. 271.)
After this occurred the trial court held a hearing outside the presence of the jury. Smith then moved for a mistrial because, he argued, the error could not be corrected with curative instructions. The trial court took the motion under advisement until later in the day and then gave the jury the following curative instruction:
"Members of the jury, the last response given by the witness to a question from Mr. Cherry was not only inappropriate and improper, but it was not a legal response. This Defendant is on trial because he is alleged to have committed a particular offense and as we talked about both yesterday and today, your sole focus is on the question of whether he is guilty or not guilty of that offense. At this stage of these proceedings his past, whatever it might be, is of no legal significance whatsoever."
(R. 278.) The trial court then polled the jury to determine if the members could follow the instructions. Each juror indicated that he or she could.
The Court then held a hearing on the issue whether the comment made by the witness warranted a mistrial. After considering arguments from both sides, the court held that there was no manifest necessity for a mistrial. (R. 310.) We agree.
Smith, citing Ex parte Sparks, 730 So.2d 113 (Ala.1998), on remand, 730 So.2d 117 (Ala.Cr.App.1999), argues that the presentation of evidence of a prior offense could not be eradicated by a curative instruction and automatically warrants reversal. However, we believe that Smith's reliance on Sparks is misplaced. See Sullivan v. State, 742 So.2d 202 (Ala.Cr.App.1999).
In Sparks, the accused was on trial for driving under the influence of alcohol and running a stop sign. Sparks testified in his own defense and denied that he had been drinking and attributed his failing his field sobriety test to problems with his knees. The city prosecutor, on cross-examination, asked Sparks if he had previously been convicted of driving under the influence. There was an objection and a motion for a mistrial. The trial court denied the motion and gave the jury a curative instruction. The Supreme Court reversed the driving-under-the-influence conviction, stating that it could not condone "a prosecutor's attempt to elicit testimony about a defendant's prior convictions in violation of the general exclusionary rule against such evidence." 730 So.2d at 115. The Court also noted that the prejudice could not be eradicated because the prior conviction was for the same offense the defendant was presently on trial for.
Here, the question asked by the prosecutor did not call for evidence that Smith had a prior record. The question called for a yes or no answerthe witness, on her own volition, elaborated on that answer; thus, her answer was nonresponsive to the prosecutor's question.
"We find that Claiborne's references to the appellant's having been in prison, which were clearly unresponsive to the questions posed are comparable to remarks that we have held can be eradicated by curative instructions." See, e.g., Bowers v. State, 629 So.2d 793, 794 (Ala.Cr.App.1993) (where `trial court, of its own volition, instructed the jurors to *823 disregard [police detective's unresponsive answer that he "understood the defendant was facing charged in Milwaukee"] and questioned jurors to ensure that they could disregard the statement,' the trial court's actions `cured any possible error'); Garnett v. State, 555 So.2d at 1155 (`any prejudice arising from [prosecutor's] question [indicating that murder defendant had been arrested for beating his wife] ... was both capable of eradication and was eradicated by the trail court's prompt action' in instructing the jurors to disregard the question and in polling the jurors to ascertain that they could disregard the question); Floyd v. State, 412 So.2d 826, 830 (Ala. Cr.App.1981) (`the trial court's action in immediately instructing the jury to disregard the prosecution's vague reference to another unspecified crime cured any potential error prejudicing the appellant's case')."
Stanton v. State, 648 So.2d 638, 643 (Ala. Cr.App.1994).
Moreover, we note that there was other evidence presented showing that Smith had been in prison. The pawnshop employee testified that when Smith pawned the power tools he showed his Alabama Department of Corrections identification card. Also, Smith said in his first statement that he had just gotten out of prison on the Friday before the robbery-murder on Sunday.

XIII.
Smith argues that there was insufficient evidence to convict him of capital murder as charged in the indictment because, he says, there was no evidence that he was armed with a power saw at the time of the robbery-murder.
The indictment against Smith read as follows:
"The Grand Jury of said County charge, that, before the finding of this indictment Joseph Clifton Smith whose name is to the Grand Jury otherwise unknown than as stated, did in the course of committing the theft of lawful United States Currency, the amount and denomination not known to the Grand Jury, used force against the person of Durk Van Dam, with intent to overcome Durk Van Dam's physical power of resistance which Joseph Clifton Smith was armed with a deadly weapon or dangerous instrument, to-wit: a power tool, in violation of § 13A-8-41 of the Code of Alabama. Smith did with intent to cause the death of Durk Van Dam cause the death of Durk Van Dam by hitting him about the head and body with an object or objects unknown to the Grand Jury, in violation of § 13A-5-40(2) of the Code of Alabama, against the peace and dignity of the State of Alabama."
(R. 6.)
What Smith fails to consider is that an indictment encompasses the conduct of an accomplice as well as a principal. As we stated in Price v. State, 725 So.2d 1003, 1055 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998):
"[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the principle wrongdoer. § 13A-2-20, -23, Code of Alabama 1975. See Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950); Robinson v. State, 335 So.2d 420 (Ala.Cr.App.1976), cert. denied, 335 So.2d 426 (Ala.1976); Heard v. State, 351 So.2d 686 (Ala.Cr.App.1977); Hill v. State, 348 So.2d 848 (Ala.Cr.App.1977), cert. denied, 348 So.2d 857 (Ala.1977). `A conviction of one charged in the indictment with having been the actual perpetrator of a crime is authorized on proof of a conspiracy or that the accused aided and abetted in the commission of the crime. Stokley v. State, 254 Ala. *824 534, 49 So.2d 284 (1950).... As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt. Lewis v. State, 456 So.2d 413 (Ala.Cr.App.1984). The trial court instructed the jury as to the laws of complicity and accomplice liability in the present case."
"Under Alabama law, the distinction between principals and accessories has long been abolished; one charged as a principal may be convicted as an accomplice, and the State is not required to notify the defendant in the indictment or otherwise that it is proceeding under a complicity theory." Johnson v. State, 612 So.2d 1288 (Ala.Cr. App.1992). We note that the trial court gave a thorough and extensive charge on accomplice liability.
In Smith's first statement to police he said that Reid dragged a skill saw blade across Van Dam's neck and yelled, "Where's the money at, give me the god-damn money or I'm fixing to kill you." In the second statement, Smith said that Reid took a "skill saw blade" to Van Dam.
There was more than sufficient evidence to show that Smith was, at a minimum, an accomplice to the murder as charged in the indictment.

XIV.
Smith argues that several comments by the prosecutor in his closing argument in the guilt phase denied him a fair trial.
When reviewing a prosecutor's comment made in argument to the jury we must look at the record as a whole and view the remark in the context of the entire trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). We have stated that the failure to object to an allegedly improper argument in a death-penalty case will weigh against a claim of prejudice. Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999). Also, "[i]mproper comments by the district attorney will result in reversal only if they `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).
"`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.'"
Wilson v. State, 777 So.2d 856, 893 (Ala.Cr. App.1999), quoting Bankhead, 585 So.2d at 106-07.

A.
Smith argues that the prosecutor improperly commented on a statement to police made by Smith's codefendant, which was never admitted into evidence. Smith challenges the following:
"Well, Jody started thinking, `Better get my story straight,' so he's banging on the door, `Hey, tell that detective I want to talk to him, I need to talk to him again,' and that's when Detective Reynolds comes back. Now, Larry's story is *825 closer to the mark. He's still lying about where the pawnshop was, but he admits more of what he did. And they got his clothes out of his Mama's washing machine, they got the tools back from the pawnshop."
(R. 657) (emphasis added). Smith argues that this comment was a reference to a statement by Smith's codefendant. There was no objection to this argument. See Rule 45A, Ala.R.App.P.
A review of the remark, together with the evidence presented at trial, shows that the prosecutor inadvertently misstated the name. The prosecutor said Larry instead of Jody. The contents of the remark reflect that the prosecutor was referring to Smith's statementnot to any statement that his codefendant may have made to police. Clearly, this was an inadvertent slip of the tongue. We find no error, much less plain error, here. Baxter v. State, 723 So.2d 810 (Ala.Cr.App.1998).

B.
Smith also argues that the prosecutor denied him a fair trial by calling him a thief. The following occurred:
"Jody, Joseph C. Smith, is a thief. He was [a] thief back in November of 1997. He stole Durk Van Dam's money, he took his wallet, he took his checkbook. For a while he had control of his truck. He took his identity, his I.D. cards, his driver's license, he took his tools, he took his shoes, his boots. And lastly, but definitely not leastly, he stole his life. He took everything from Durk Van Dam."
(R. 648.) There was no objection to the above remark; thus, we apply a plain-error review. Rule 45A, Ala.R.App.P. The failure to object to an alleged improper argument does weigh against a claim of prejudice. Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999).
This Court in Barbee v. State, 395 So.2d 1128, 1134 (Ala.Cr.App.1981), noted:
"The digest abounds with instances where the prosecutor has commented on the defendant's character or appearance. Hall v. United States, 419 F.2d 582 (5th Cir.1969) (`hoodlum'); Wright v. State, 279 Ala. 543, 188 So.2d 272 (1966) (`Judas'); Rogers v. State, 275 Ala. 588, 157 So.2d 13 (1963) (`a slick and slimy crow'); Watson v. State, 266 Ala. 41, 93 So.2d 750 (1957) (`a maniac'); Weaver v. State, 142 Ala. 33, 39 So. 341 (1905) (`beast'); Liner v. State, 350 So.2d 760 (Ala.Cr. App.1977) (`a rattlesnake' and `a viper'); Jones v. State, 348 So.2d 1116 (Ala.Cr. App.), cert. denied, Ex parte Jones, 348 So.2d 1120 (Ala.1977) (`a purveyor of drugs'); Kirkland v. State, 340 So.2d 1139 (Ala.Cr.App.), cert. denied, Ex parte Kirkland, 340 So.2d 1140 (Ala. 1977) (`slippery'); Jeter v. State, 339 So.2d 91 (Ala.Cr.App.), cert. denied, 339 So.2d 95 (Ala.1976), cert. denied, 430 U.S. 973, 97 S.Ct. 1661, 52 L.Ed.2d 366 (1977)(`a flim flam artist'); Cassady v. State, 51 Ala.App. 544, 287 So.2d 254 (1973) (`a demon'); Reed v. State, 32 Ala.App. 338, 27 So.2d 22, cert. denied, 248 Ala. 196, 27 So.2d 25 (1946) (`lied like a dog running on hot sand'); Williams v. State, 22 Ala.App. 489, 117 So. 281 (1928) (`a chicken thief); Ferguson v. State, 21 Ala.App. 519, 109 So. 764 (1926) (`a smart aleck'); Quinn v. State, 21 Ala.App. 459, 109 So. 368 (1926) (`a wild catter'); Thomas v. State, 19 Ala. App. 187, 96 So. 182, cert. denied, Ex parte Thomas, 209 Ala. 289, 96 So. 184 (1923) (`a moral pervert'); Beard v. State, 19 Ala.App. 102, 95 So. 333 (1923) (`seducer')."
References in closing argument to a defendant's character will not constitute reversible error if they are supported by the record. Nicks v. State, 521 So.2d 1018, 1023 (Ala.Cr.App.1987), aff'd, 521 So.2d *826 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). See Schartau v. State, 534 So.2d 378 (Ala.Cr. App.1988) (reference to appellant as thief did not amount to reversible error); Jackson v. State, 249 Ala. 348, 31 So.2d 519 (1947) (reference to appellant as "damned thief" did not amount to reversible error).
Here, the comment was supported by the record. Smith told police that he stole Van Dam's tools and pawned them. By his own admission, he was a thief in November 1997 as the prosecutor said in his argument.

C.
Smith argues that the prosecutor prejudiced him by referring to him as a liar. The following occurred:
"And Jody gave them two statements. The first statement he's lying through his teeth. He said, `I don'tII didn'tI didn't do anything to that man, I didn't touch that man, my fingerprints won't be on nothing, I didn't go anything.' Now, that was a lie."
(R. 656.) There was no objection to this comment; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
Clearly, this characterization of the appellant is supported by the record. Smith, in his first statement, totally denied any involvement in the robbery-murder. In the second statement he admitted his participation in the robber-murder. "[T]he prosecutor, in the appropriate case, may use opprobrious terms to characterize the accused or his conduct, provided that the remarks are in accord with the evidence." Bankhead, supra.

D.
Smith argues that the prosecutor misstated the law when he argued, "If the Judge let you see it, then it was evidence and you could consider it." (R. 657-58.)
There was no objection to this comment; thus, our review is limited to determining whether there was plain error. Rule 45A, Ala.R.App.P.
Here, the trial court repeatedly told the jurors that comments of counsel were not evidence and that it was the court's duty to instruct them on the law. We do not believe that this isolated statement by the prosecutor so "infected the trial with unfairness" that Smith was denied due process. Darden v. Wainwright.

E.
Smith argues that the prosecutor illegally argued victim-impact evidence at the guilt phase and that her doing so resulted in prejudice to Smith.
During the closing argument the prosecutor argued:
"In the final seconds of his life Durk Van Dam pleaded for his life. He had two little boys that he knew he would never see again. I ask that you let that be the picture in your mind as you decide what intent is, as they robbed him and they slowly and mercilessly intentionally and cruelly kicked and beat this man to death."
(R. 675.)
We agree with the Statethe above statement was a reply to the defense's argument that there was absolutely no evidence of intent. "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994). Also, the argument was based on the facts presented at trial through Smith's own statement, in which he told police, "The guy's hollering, `No, sir, no, sir, please, don't kill me, I got two little boys, please, don't kill me.'" (R. 470.) A prosecutor may argue facts in evidence. *827 Manigan v. State, 402 So.2d 1063 (Ala.Cr. App.), cert. denied, 402 So.2d 1072 (Ala. 1981). The argument was based on evidence presented at trial.
We have reviewed all of the challenged comments made by the prosecutor and are confident that none of them so infected the trial with unfairness that Smith was denied due process. Darden v. Wainwright.

XV.
Smith argues that the trial court's jury instructions were flawed for several reasons.
"`A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), aff'd in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State.'"
Griffin v. State, 790 So.2d 267, 332 (Ala.Cr. App.1999), quoting Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).

A.
Smith first argues that the trial court erred in giving an instruction on flight because, he argues, there was no evidence of flight. He also argues that even if an instruction was warranted the one given was erroneous.
Smith argues in his brief to this Court that there was no evidence of flight because, "Indeed, the State offered no evidence that Mr. Smith ever left the small corner of Mobile County where he lived and all the events in this case occurred." (Smith's brief to this Court at page 20.)
McElroy's Alabama Evidence states the following concerning evidence of flight:
"The prosecution is generally given wide latitude in proving things that occurred during the accused's flight. Indeed, the term `flight' includes any conduct of the accused that is relevant to show a consciousness of guilt. Such conduct may include the use of aliases, concealment of identity, attempting to avoid arrest and the use of false exculpatory statements."
McElroy's § 190.01(1) (5th ed.1996) (emphasis added).
In Ex parte Jones, 541 So.2d 1052, 1053-57 (Ala.1989), Justice Maddox, writing for the Court, detailed what constitutes evidence of flight in Alabama. Justice Maddox stated:
"Evidence of flight has long been allowed in the courts of Alabama, and the State is generally given wide latitude in proving things that occurred during the accused's flight. C. Gamble, McElroy's Alabama Evidence, § 190.01(1) at 381 (3d ed.1977). However, as Dean Gamble has noted:
"`Logic would dictate that at some point the flight of the accused will be so far removed from the time of the charged crime that such flight will be too remote to be relevant as having probative value upon the accused's consciousness of guilt. However, such a case has not yet made its way before the appellate courts of Alabama."
"Id., § 190.01(4) at 383.
"One of this Court's first detailed examinations of evidence of flight came in Levison v. State, 54 Ala. 520 (1875); there, this Court stated:
"`Flight, the demeanor when arrested, stolidity or trepidation, under accusation, prevarication in answer to inquiries relating to the offense, or to his conduct, the fabrication or suppression *828 of evidence, or previous threats, or antecedent grudges, are all evidentiary facts against the person to whom they are imputable, dependent for their value on a connection with other criminating circumstances. They are evidence against the party to whom they are imputable, and not constituting the guilty act, only pointing to him as the guilty agent, are not evidence for or against another with whom he has no connection. The most inconclusive of the criminating circumstances, that which, not combined with other factors, is of the least probative force is flight. [citation omitted.] It may be attributable to fear, or to impatience and restlessness, under the duress of imprisonment, or to a consciousness of guilt. Much depends on the character of the mind, temperament and education. One will, with fortitude, endure imprisonment without murmuring, and without an effort to fly, though tortured with the consciousness of crime; while another of a different mental, or moral, or physical organization, conscious of innocence, fretting under unaccustomed restraints, or fearful of the issue of the events leading to his imprisonment, will fly on the first opportunity. Flight is of consequence, in itself, delusive and inconclusive as a criminating fact.'
"54 Ala. at 527. (Emphasis added.)
"In an even earlier case, this Court did hold, however, that care must be taken in introducing evidence like evidence of flight. In Liles v. State, 30 Ala. 24, 24-25 (1857), this Court stated:
"`In determining how far the conduct of a prisoner may be evidence against him, we feel that we are treading on dangerous and doubtful ground. One of acute sensibilities might be overwhelmed by a simple accusation of crime; while a hardened offender would stand unabashed, and undisturbed in muscle, though conscious of the deepest guilt. A respectable modern writer, speaking of the effect produced by imputation of crime, uses the language, that `it is an impulse of nature, consequent upon extreme surprise, to which the innocent may yield as well as the guilty. It may happen that the more innocent the party, the greater the shock occasioned by such a proceeding.' Burrill on Cir. Ev., 476-7; Smith v. The State, 9 Ala. 990-5.'
". . . .
"One of the most recent cases summarizing the Alabama rule on this subject is Beaver v. State, 455 So.2d 253, 257 (Ala.Crim.App.1984):
"`"In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution... as tending to show the accused's consciousness of guilt.... The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight." C. Gamble, McElroy's Alabama Evidence § 190.01(1) (3rd ed.1977). "Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime." Tate v. State, 346 So.2d 515, 520 (Ala.Cr.App. 1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. See Tate, supra; Neal v. State, 372 So.2d 1331, 1344-45 (Ala. Cr.App.1979). For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible. Crenshaw v. State, 225 Ala. 346, 348, 142 So. 669 (1932). Additionally, the evidence that the accused was observed at the police station throwing keys in a trash can was admissible. *829 Any act proving or tending to prove the accused's effort or desire to obliterate, destroy, or suppress evidence of a crime is relevant and admissible even if it involves evidence of a separate offense. Watwood v. State, 389 So.2d 549, 551 (Ala.Cr.App.), cert. denied, Ex parte Watwood, 389 So.2d 552 (Ala.1980).'"
See also Ex parte Weaver, 678 So.2d 284 (Ala.), on remand, 678 So.2d 292 (Ala.Cr. App.1996) (quoting Jones in depth).
Here, the evidence indicated that Smith and Reid attempted to hide the body under a mattress, and tried to steal Van Dam's truck but it got stuck in the mud and they left it behind, and that Smith went back to the Highway Host motel to shower and to change clothes. He admitted to police that he tried to wipe his fingerprints off the truck and also told police that he had washed the clothes he was wearing at the time of the robbery-murder. Also, when he was first questioned about the murder he denied any involvement and placed the blame for the robbery-murder on Reid. Clearly, these facts are sufficient to fit within the definition of "flight," as they evidence a consciousness of guilt, as that term is defined in Alabama. McElroy's Alabama Evidence, § 190.1(1). All of the conduct evidences a "consciousness of guilt" on the part of Smith.
Also, this Court has never held that in order to establish flight the State must prove that the accused left the city or community where the crime occurred. Muse v. State, 29 Ala.App. 271, 196 So. 148 (1940), cert. denied, 239 Ala. 557, 196 So. 151 (Ala.1940) ("[T]here can be no set or specific time necessary to constitute flight, and the distance the accused ran before he was apprehended is also immaterial.") Other states have reached this same conclusion. State v. Hatten, 297 Mont. 127, 991 P.2d 939 (1999) ("flight includes fleeing, even a short distance, to wherever a defendant thinks is safe to dispose of evidence."); State v. Hill, 875 S.W.2d 278, 284 (Tenn.Crim.App.1993) (flight occurred when accused ran between two houses "Flight from the crime scene may be taken in any manner."); Baier v. State, 891 P.2d 754 (Wyo.1995) (evidence sufficient to show flight where accused left the hotel where assault occurred and was apprehended a short distance away by police); State v. Moseley, 338 N.C. 1, 449 S.E.2d 412 (1994), cert. denied, 514 U.S. 1091, 115 S.Ct. 1815, 131 L.Ed.2d 738 (1995) (evidence of flight sufficient because accused left the victim in a secluded area, took the victim's identification, and left the scene).
Smith argues that the court's instruction on flight was erroneous because the instruction told the jury that the State had presented evidence of flight. The trial court gave the following instruction on flight:
"In this case you have heard testimony concerning flight. That is, that the Defendant allegedly left from the scene of the purported crime. With reference to evidence that was presented in this case bearing on the alleged flight by the Defendant from the scene of the alleged crime, the jury is instructed that evidence may be offered tending to show flight of the Defendant, and when such evidence is offered by the State it may be considered by you, the jury in connection with all of the other evidence in the case of circumstances tending to prove guilt, and in connection with such evidence consideration should be given to any evidence of the motive which may have prompted such flight. That is, whether a consciousness of guilt, an impending or likely apprehension of being brought to justice caused the flight or whether it was caused from some other or more insistent motive.

*830 "In the first place, where evidence is offered to show the Defendant's flight, that is, he went away from the scene of the alleged offense, it would be for you, the jury, to say whether it is flight as a matter of fact. The jury would have to determine from the evidence the question whether this was flight or not and then you would further consider such evidence in light of all the other evidence you have heard in this case, including any evidence to negate or explain any such evidence of flight and whether such evidence was a reasonable explanation or not, all of which you would consider in connection with all the other evidence giving each part of the evidence such weight as you, the jury, feel it is entitled to receive in this particular case."
(R. 700-01.)
Defense counsel objected to the court's instruction on flight and the court recharged the jury as follows:
"Finally, and consistent with the notion that I do not want you to think that I have commented on the evidence in any way, shape or form, in charging you on the issue of flight I remind you that what was said was that it is for you to determine whether or not there was flight in this case. And if and only if you determine as a matter of fact that there was flight in this case would you then be permitted by law to perceive and consider what, you know, may have prompted such flight.
"But again, can each of you accept the proposition that the Court is not in any way, shape or form trying to suggest to you that there was flight in this case? If you cannot, please, raise your hand."
(R. 720.)
The trial court cured the defect now asserted on appeal. Also, the instruction given in this case was similar to an instruction in Minor v. State, 780 So.2d 707 (Ala.Cr.App.1999), that this Court upheld. The instruction correctly explained Alabama's law on flight.

B.
Smith argues that the trial court's instruction on reasonable doubt was flawed because it contained the term "actual doubt" in violation of the United States Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
Smith did not object to the trial court's instruction on reasonable doubt; thus, our review is limited to plain error. Rule 45A, Ala.R.App.P.
The Court gave the following instruction:
"A reasonable doubt is not a mere possible doubt because everything related to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It is a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but it is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence or a combination thereof. It is a doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture."
(R. 680.)
"`In Cage, the United States Supreme Court found that if the trial court defines "reasonable doubt" by using the terms "grave uncertainty," "actual substantial doubt" and "moral certainty," a reasonable juror could interpret the instructions to *831 mean that a lesser degree of proof is needed to convict than is required by the due process clause.'" McWhorter v. State, 781 So.2d 257, 303 (Ala.Cr.App.1999), quoting Lawhorn v. State, 756 So.2d 971 (Ala.Cr. App.1999).
The reasonable doubt instruction given here was virtually identical to the pattern jury instruction on the burden of proof. The instruction did not contain the term "actual substantial doubt." "`A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error.'" Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Cf. Ex parte Wood, 715 So.2d 819 (Ala.), cert. denied, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998) (court noted that it had never held that following the pattern jury instruction may never amount to plain error).
We have upheld a similar reasonable doubt instruction against a claim of plain error. Smith v. State, 756 So.2d 892 (Ala. Cr.App.1998).

C.
Smith argues that the trial court's jury instruction on accomplice liability was erroneous because, he says, it lowered the State's burden of proof by allowing for the jury to find Smith guilty by transferring Reid's intent.
The trial court gave a detailed instruction on accomplice liability. At several points in the charge it instructed the jurors that an accomplice must intend for the conduct to occur. The court instructed in part:
"The accomplice is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy formed. He is not responsible for any special act not within the scope of a common purpose, but which grow out of the individual malice of another perpetrator when intent is one of the required constituent elements of an offense. And in each of the offenses that I am going to define for you intent is a requirement."
(R. 681-82.) The court further stated, "it must be shown beyond a reasonable doubt that he was present with the intent to aid and abet the principal actor and it must also be shown that he possessed the same intent to kill." (R. 682.)
The court did state, "Without this individual intent or personal knowledge it cannot be affirmed that he aided or abetted in the crime charged. This need not, however, be positively proved." (R. 682.) However, the court further charged the jury:
"A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific. Intent is a state of mind. There is generally no way to prove intent by positive evidence. It usually has to be proven by circumstantial evidence."
(R. 684.)
The court's instructions were thorough and accurate statements of the law. There was no error in the court's instruction on accomplice liability.

D.
Smith further argues that the trial court erred in not instructing the jury on drawing "no adverse inference" from Smith's failure to testify at trial.
Smith never requested a no-adverse-inference instruction and never objected when the judge failed to sua sponte give such an instruction. The United States Supreme Court in Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 *832 (1981), held that the Fifth Amendment requires the giving of a "no-adverse-inference" instruction when requested to do so by trial counsel. The duty to give such an instruction arises only when a request has been made to give the instruction to the jury. Carter.
We have followed the prevailing view and held that a trial court commits no error in failing to sua sponte give a "no-adverse-inference" instruction. Phillips v. State, 726 So.2d 292 (Ala.Cr.App.1998).
"Appellant cites Carter v. Kentucky, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), for the proposition that a trial judge in a criminal case must instruct the jury that the defendant has a right not to testify and no adverse inference shall be drawn from his failure to do so. In this case there was no request for such an instruction. We disagree that the trial judge should have instructed the jury sua sponte. It is a matter of judgment for defense counsel to decide whether such an instruction is more harmful than beneficial. Counsel may decide it merely calls attention to the problem. We adhere to the requirement that such an instruction shall be given when requested."
Ice v. Commonwealth, 667 S.W.2d 671, 677 (Ky.), cert. denied, 469 U.S. 860, 105 S.Ct. 192, 83 L.Ed.2d 125 (1984). See also Dutton v. State, 674 P.2d 1134, 1140 (Okla.Cr. App.), cert. denied, 467 U.S. 1256, 104 S.Ct. 3548, 82 L.Ed.2d 850 (1984) ("We reject appellant's assertion that a trial judge is obligated to give a cautionary instruction on its own initiative."); Davis v. State, 161 Ga.App. 358, 359, 288 S.E.2d 631, 632 (1982) ("we cannot agree that the failure to give the charge sua sponte was error"); People v. Castaneda, 81 Mich. App. 453, 265 N.W.2d 367 (1978) ("Inasmuch as defendant did not request the instruction, the issue has been waived...."). See also Mills v. Commonwealth, 996 S.W.2d 473 (Ky.1999), cert. denied, 528 U.S. 1164, 120 S.Ct. 1182, 145 L.Ed.2d 1088 (2000); People v. Sully, 283 Cal.Rptr. 144, 53 Cal.3d 1195, 812 P.2d 163 (1991), cert. denied, 503 U.S. 944, 112 S.Ct. 1494, 117 L.Ed.2d 634 (1992); State v. Baxter, 51 Haw. 157, 454 P.2d 366 (1969), cert. denied, 397 U.S. 955, 90 S.Ct. 984, 25 L.Ed.2d 138 (1970).

Penalty-Phase Issues

XVI.
Smith argues that Alabama's method of executionthe electric chairresults in cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution. The use of the electric chair, as a means of satisfying a capital punishment, has repeatedly withstood constitutional challenge. See Woods v. State, 789 So.2d 896 (Ala.Cr.App.1999); Jackson v. State, [Ms. CR-97-2050, May 28, 1999] ___ So.2d ___ (Ala.Cr.App.1999); Scott v. State, 728 So.2d 164 (Ala.Cr.App.1997), aff'd, 728 So.2d 172 (Ala.), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Williams v. State, 556 So.2d 737 (Ala.Cr.App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala. 1987), on remand, 556 So.2d 746 (Ala.Cr. App.1988), after remand, 571 So.2d 336 (Ala.Cr.App.1989), aff'd, 571 So.2d 338 (Ala.1990), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991).

XVII.
Smith argues that Alabama's system of limiting the compensation for attorneys appointed on capital cases to $1,000 for out-of-court work violates the separation-of-powers doctrine, constitutes a taking without just compensation, violates the Due Process Clause, deprives indigent capital defendants of the effective assistance of counsel, and violates the Equal Protection Clause. These claims have repeatedly been rejected. See Ex parte Smith, 698 *833 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); May v. State, 672 So.2d 1310 (Ala.1995); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), on remand, 581 So.2d 536 (Ala.Cr.App.1991), after remand, 698 So.2d 189 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
"It should be noted that the Alabama Legislature recently passed the `Investment in Justice Act of 1999,' and, in pertinent part, that Act amended § 15-12-21. Under the new Act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time."
McWhorter v. State, 781 So.2d 257, 306 (Ala.Cr.App.1999).

XVIII.
Smith argues that he was denied his right to a just sentencing determination by remarks made by the prosecutor in the sentencing phase.
We review the allegations of prosecutorial misconduct using the standards of review discussed by this Court in Part XIV of this opinion.

A.
Smith argues that the following comment implied that Smith should be sentenced to death because he was mentally retarded:
"The Doctor said that this Defendant has a low IQ and I asked him this question because from your own common sense, from your own experience you know it to be true, there are folks out there with marginal IQs who are streetwise. They get along they get by, they survive sometimes better than the rest of us in certain situations. This man's been in prison, this man's been around, this man is streetwise. He knew what he was doing."
(R. 831.)
There was no objection to the above comment; thus, we apply a plain-error analysis. Rule 45A, Ala.R.App.P.
The above comment did not imply that Smith should be sentenced to death because he is mentally retarded. The comments were based on the evidence presented through Dr. James F. Chudy's testimony. Dr. Chudy, a clinical psychologist, testified that people with low IQs can be streetwise and can function as well as, or better than, the average person. There comments were based on facts in evidence and were the proper subject of comment in closing. See Manigan v. State, 402 So.2d 1063 (Ala.Cr. App.), cert. denied, 402 So.2d 1072 (Ala. 1981).

B.
Smith argues that the prosecutor committed reversible error by, he argues, commenting that any sentence but death would be an insult to the victim's family. The following occurred:
"Life without parole means just that. That he would serve the rest of his natural life in prison. But what does that say to Durk Van Dam's family? What does that say to them about their brother, about their father, about their son, about their uncle? It says Durk's life was valueless. There was no value *834 in his life and there was no meaning in his death. You see, life without parole means that Jody would live."
(R. 820-21.)
As the State asserts in brief, this type of argument is permissible at the sentencing phase of a capital trial. As this Court stated in Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Cr.App.1998):
"`[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, [his] family.' Payne v. Tennessee, 501 U.S. at [808,] 824, 111 S.Ct. 2597[, 115 L.Ed.2d 720 (1991)], citing Booth v. Maryland, 482 U.S. 496, 517, 107 S.Ct. 2529, 96 L.Ed.2d 440 (White, J., dissenting).
"`It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Smith] did not receive a fair trial simply because the jurors were told what they probably had already suspected that [Van Dam] was not a "human island," but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. at 838, 111 S.Ct. 2597.)'
"Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995)."
There was no improper argument here.

C.
Smith argues that the following comment made by the prosecutor "impermissibly criticiz[ed] his exercise of [his right to a trial by jury] in violation of Alabama law". (Smith's brief to this Court at p. 82):
"Now, my Mama always told me as I was sitting at her knee growing up as a young girl that there are consequences to your conduct. Now, my Mama didn't use those words. What she told me was, `Baby, you're going to reap what you sow.' If you sow seeds of brutality, if you kill people, you're going to reap that back. And today for Joseph Smith it is harvest time. It is because of Jody that you all are being placed with this enormous and awesome responsibility. It is because Jody stood out on Shipyard Road and was making decisions about the life of Durk Van Dam that you are placed here today. It is Jody's fault, but it's because of the decisions that Jody made that you are called upon today to make a decision about his life."
(R. 820.) There was no objection to this comment; thus, our review is limited to plain error. Rule 45A, Ala.R.App.P.
By no stretch of the imagination can the above comment be interpreted as criticizing Smith's right to a trial by jury. Clearly, the prosecutor was arguing that Smith was responsible for his own actions and that he intended to rob and kill Van Dam, and, thus, that his sentence should be death.

XIX.
Smith argues that there were numerous errors in the trial court's instructions to the jury and that those errors resulted in his being denied a fair and accurate sentence determination.
We use the same standards of review we discussed in Part XV of this opinion.

*835 A.
Smith first argues that the trial court incorrectly instructed the jury on what it had to find before it could return a verdict of life imprisonment without parole.
The trial court gave the following instruction:
"All right. And to repeat, in order to return an advisory verdict of death by electrocution at least 10 of your number must be satisfied beyond a reasonable doubt that aggravating circumstances have been proven and outweigh mitigating circumstances. In order to return an advisory verdict recommending life without parole at least 7 of your number must be satisfied beyond a reasonable doubt of the existence of mitigating circumstances and that those mitigating circumstances outweigh the aggravating circumstances."
(R. 848.)
Smith objected to the above instruction and the trial court clarified its instruction on the burden of proof necessary to find mitigating circumstances. The trial court reinstructed the jury as follows:
"Ladies and gentlemen, I wish to make clear the distinction between the burden of proof as it relates to proof of an aggravating circumstances and proof of a mitigating circumstance.
"Proof of a mitigating circumstance only requires proof by a preponderance of the evidence, which I will define again for you. Proof of an aggravating circumstance requires proof beyond a reasonable doubt.
"And I repeat, a mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist unless taking the evidence as whole it is more likely than not that the mitigating circumstances does not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstance, then you should find and consider that mitigating circumstance unless you find the evidence is such that it is more likely than not that the mitigating circumstance does not exist.
"Only an aggravating circumstance must be proven beyond a reasonable doubt and the burden is always on the State of Alabama to convince you from the evidence beyond a reasonable doubt that such an aggravating circumstance exists and the burden is also on the State to prove to you beyond a reasonable doubt that the aggravating circumstance or circumstances, should you find that they exist, outweigh any mitigating circumstances which need only be proven by a preponderance of the evidence."
(R. 854-56.)
Clearly, the trial court's restatement of the burden of proof was a correct statement of the law and corrected the court's earlier misstatement concerning the burden of proof necessary to find mitigating circumstances. Also, the trial court thoroughly instructed the jury that the aggravating circumstances must outweigh the mitigating ones and that this weighing is not merely a numerical one. (R. 844.)
The trial court's instructions on these principles of law were both thorough and accurate. No error occurred here.

B.
Smith also argues that the trial court's failure to instruct the jury that its finding as to mitigating circumstances did not have to be unanimous, implied that its *836 findings as to the mitigating circumstances had to be unanimous. There was no objection raised at trial concerning the court's failure to instruct that the jury's finding did not have to be unanimous. We review this issue for plain error. Rule 45A, Ala. R.App.P.
A review of the jury's instruction on mitigating circumstances does not reflect that the trial court instructed the jury that its decision that evidence was mitigating had to be unanimous. The trial court instructed that jury in accordance with the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178.
As we recently stated in Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___ (Ala.Cr.App.1999):
"This Court addressed a similar issue in Freeman v. State, 776 So.2d 160 (Ala. Cr.App.1999):
"`Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence of a mitigating circumstance. Freeman did not object at trial to the trial court's instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule Ala.R.App.P.'
"We have reviewed the trial court's instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997)."

C.
Smith argues that the trial court erred in referring to the allegedly erroneous instruction it had given on reasonable doubt in the guilt phase of the proceedings.
In Part XV.B. of this opinion we held that the court's reasonable doubt instruction was not erroneous. Thus, our focus is on whether the trial court erred in not reinstructing the jury on reasonable doubt but rather in relying on an instruction he had given in the guilt phase.
We observe that Smith did not object to the court's relying on its previous given instruction. Our review is limited to plain error. Rule 45A, Ala.R.App.P.
Here, the trial court at the beginning of its charge stated:
"It is again my duty to instruct you on those rules of law that you shall apply in your determination of the appropriate punishment in this case. In charging you I want to remind you of the instructions that you received yesterday during the guilt phase, particularly concerning the basic law in defining the term `reasonable doubt,' as well as your duties and functions as jurors. If any one of you feels that it is necessary, I will recharge you as to each and every one of those principles of law."
(R. 834.) Also, the reasonable doubt charge was given within 24 hours of the court's instructions in the penalty phase. As we stated in Griffin v. State, 790 So.2d 267 (Ala.Cr.App.1999):
"The trial court gave a detailed definition of reasonable doubt during the guilt *837 phase at approximately 5:00 p.m. and then referenced his instruction the following morning at approximately 11:00 a.m. Only a short timeless than 24 hourslapsed between the instructions Additionally, the trial court asked the jury if it needed to reinstruct on reasonable doubt and no one indicated that he did not remember the previous instruction. `"It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge."` Collins v. State, 611 So.2d 498, 503 (Ala.Cr.App.1992), quoting Brannon v. State, 549 So.2d 532, 542 (Ala.Cr.App.1989), quoting Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr.App. 1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984)."
As we did in Griffin, we find no plain error here.

D.
Smith argues that the trial court's instruction on the aggravating circumstance that the offense was especially heinous, atrocious, or cruel, as compared to other capital cases was erroneous because, he says, it implied that the jury was to compare this case to others and the instruction expanded on the definition.
There was no objection to the court's charge on this aggravating circumstance; thus, we apply the plain-error doctrine. Rule 45A, Ala.R.App.P.
The trial court gave the following instruction:
"The term `heinous' means extremely wicked or shockingly evil.
"The term `atrocious' means outrageously wicked and violent.
"The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance [are] those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses. For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent."
(R. 838.)
The trial court's jury instruction is identical to the Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178 and tracks the caselaw definition of the especially heinous, atrocious, or cruel aggravating circumstance. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and Kyzer v. State, 399 So.2d 330 (Ala.1981). The jury instruction was not erroneous; it was a correct definition of this aggravating circumstance.

E.
Smith argues that the trial court diminished the jury's role at sentencing by reminding it that its verdict would only be a recommendation.
We have repeatedly stated that a trial court does not diminish the jury's role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict. Taylor v. State, 666 So.2d 36 (Ala.Cr. App.1994), on remand, 666 So.2d 71 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).

*838 XX.
Smith argues that trial court's sentencing order is erroneous for several reasons.
Smith did not object to any of the alleged errors he now argues occurred in the trial court's sentencing order. We are confined to reviewing these allegations for plain error. Rule 45A, Ala.R.App.P.

A.
Smith contends that the trial court erroneously relied upon the sentencing recommendation of the victim's family. The record reflects that included in the presentence report is a victim-impact statement from the victim's familyhis parents, sisters, and sons. The statement relates that the victim's family "upholds the verdict made by the jury" and that Smith should never be allowed to enter society.
The trial court stated that it had read and was familiar with the presentence reportthe court also stated the following before imposing sentence:
"The law requires that the Court weigh the statutorily enumerated aggravating circumstances against both the statutory enumerated mitigating circumstances, as well as any other factor which might reasonably be considered in mitigation."
(R. 19, sentencing hearing before the judge.) Also, the sentencing order reflects that the trial court considered only what the law allows in determining whether to impose the death penalty.
The record reflects that the trial court did not consider any sentencing recommendations of the victim's family when imposing sentence. No plain error occurred here. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).

B.
Smith argues that the trial court erred in failing to find several mitigating circumstances.
First, Smith argues that the trial court should have found as a mitigating circumstance that Smith committed the act while he was "under the influence of extreme mental or emotional disturbance." § 13A-5-51(2), Code of Alabama 1975. Specifically, he states that the psychologist testified that Smith had an array of mental problems and that he was borderline retarded.
The trial court, when evaluating this statutory mitigating circumstance, stated the following in its order:
"The capital offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. The Court has carefully reviewed and weighed both the report and testimony of Doctor James Chudy, a clinical psychologist, in the context of the facts underlying the offense charged and proven.
"The value of human life mandates that the Defendant's troubled history and array of psychological disorders not psychosisbe balanced against Dr. Chudy's conclusions that the Defendant could appreciate the wrongfulness of his acts and was competent and in control at the time of the crime.
"The conclusion is fortified by the Defendant's conduct on November 23, 1997, and thereafter. The robbery and murder of Durk Van Dam were calculated, intentional acts. The Defendant possessed the presence of mind to hide the victim's tools which he directed Russell Harmon to retrieve. He had the guile *839 to attempt to minimize his participation in the crime in his initial statement of investigators on November 25, 1997, and in his subsequent confession he demonstrated the presence of mind to admit he `F ____ Up." The Court concludes that the Defendant was not mentally or emotionally disturbed neither to an extreme extent, nor to the extent this mitigating circumstance exists."
(R. 188.)
We have stated, "`merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla. 1981) ]; Smith [v. State, 407 So.2d 894 (Fla.1981) ].'" Loggins v. State, 771 So.2d 1070, 1088 (Ala.Cr.App.1999), quoting Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr. App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
Here, the trial court's findings were supported by Smith's statements to police. There was no evidence that Smith was under extreme mental and emotional disturbance at the time of the robbery-murder.
Smith also argues that the trial court erred in not finding, as mitigation, that he acted under the domination of another, § 13A-5-51(5). The trial court stated that the "record is devoid that the Defendant on November 23, 1997, acted under the domination of Larry Reid or anyone else." This finding is also supported by Smith's admissions to police. Smith said that both he and Reid planned to rob Van Dam, that he suggested that they dispose of the body in a nearby lake, and that he took the tools to the pawnshop. Smith did not state in his statement to police that he was threatened to participate in the robbery-murder. He told police in both statements that Reid threatened him if he told anyone about the robbery-murder. The court's failure to find this as a mitigating circumstance is supported by the record.
Smith argues that the trial court erred in failing to find as nonstatutory mitigating evidence his abusive childhood home and the fact that he was mentally retarded. The trial court, when considering the nonstatutory mitigating evidence, stated the following:
"The testimony of Dr. Chudy and the Defendant's mother give rise to a duty to consider the non-statutory mitigating circumstances.
"The potential existence of nonstatutory mitigating circumstances come from further consideration of Doctor Chudy's testimony and that of his mother. It is irrefutable that this Defendant is the product of an abusive environment woefully lacking in nurturance and emotional support. These factors, though regrettable, are not a license for violence, nor do they justify any act of senseless rage directed at an innocent human being. Were this the case every person from a deprived background could explode at will without fear of consequence.
"Likewise, the Defendant's lack of intelligence is not an excuse for murder, especially in the context of this case. The Defendant knew he had `F ____ Up' and while in control as he savagely attacked Durk Van Dam.
"Therefore, these nonstatutory circumstances, though thoughtfully considered and applied, do not merit significant consideration."
(R. 190.) "`Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.'" Boyd v. State, 715 So.2d 825, 840 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 *840 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The trial court's findings are more than supported by the evidence presented at trial and contained in the record.

C.
Smith argues that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The trial court in its sentencing order stated the following:
"Doctor Julia Goodin, a board certified forensic pathologist, testified to a constellation of injuries which mandate consideration of the applicability of this aggravating circumstance within the narrow context of Kyzer v. State, 399 So.2d 330 (Ala.1981).
"The cause of the victim's death was multiple blunt force injuries, totalling approximately thirty-five (35) separate, distinct exterior injuries to the victim's head, torso, and appendages and eleven (11) separate, distinct injuries which caused internal trauma. Doctor Goodin testified that the victim was repeatedly beaten, cut, and kicked, and additional testimony established that a variety of tools were used as weapons.
"The victim, furthermore, did not die quickly. According to Doctor Goodin, she opined that the likely mechanism of death was rib fractures which probably resulted in a pneumothorax and a collapsed lung, probably leaving the victim gasping for breath, for an unspecified period of time. Therefore, this Section 13A-5-49(8) aggravating circumstance is proven beyond a reasonable doubt and is considered."
(R. 186.)
The Alabama Supreme Court in Ex parte Clark, 728 So.2d 1126 (Ala.), on remand, 728 So.2d 1141 (Ala.Cr.App.1998), characterized this aggravating circumstance as follows:
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey [v. Georgia], 446 U.S. [420] 431, 100 S.Ct. 1759, 64 L.Ed.2d 398 [(1980)]). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981))(emphasis added)."
We have upheld a finding that the murder was especially heinous, atrocious, or cruel, where the victim was severely beaten. See Ex parte Hutcherson, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999); Ashley v. State, 651 So.2d 1096 (Ala.Cr.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Cr. App.1993), aff'd, 632 So.2d 981 (Ala.1993), cert. denied, 513 U.S. 1189, 115 S.Ct. 1251, 131 L.Ed.2d 132 (1995).
Clearly, the testimony established that Van Dam was severely beaten for approximately 45 minutes and that he was left to die under a mattress. Smith said that one point he begged for his life because of his two young sons. Also, Van Dam tried to *841 defend himself against the attack as evidenced by the many defensive wounds he sustained to his hands. The coroner also testified that Van Dam died a slow death because of the collapse of one of his lungs. One can also infer from the evidence that Van Dam lived long enough to crawl into his truck, after his severe and prolonged beating, where he died. There was more than sufficient evidence presented for the trial court to find that the murder was "especially heinous, atrocious, or cruel" as compared to other capital murders.

D.
Smith argues that the trial court erred in relying on a nonstatutory aggravating factor when the court stated in its sentencing order that Smith "is a demonstrable danger to civilized society." (R. 190.)
The record reflects that this statement was made at the end of the trial court's application of the aggravating and the mitigating circumstances and at the beginning of the court's final sentence pronouncement. It is clear from the order that the court did not rely on this finding as an nonstatutory aggravating circumstance. See Burgess v. State, 744 So.2d 958 (Ala. Cr.App.1998).

XXI.
Last, as required by § 13A-5-53, Ala.Code 1975, we will address the propriety of Smith's conviction for capital murder and the sentence to death by electrocution. Smith was indicted and convicted of murdering Durk Van Dam during the course of a robbery, an offense defined as capital in § 13A-5-40(a)(2).
The record reflects that Smith's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances and mandated that Smith be sentenced to death. The trial court found no statutory mitigating circumstances. The trial court made the following findings about the nonstatutory mitigating circumstances:
"The testimony of Doctor Chudy and the Defendant's mother give rise to a duty to consider the non-statutory mitigating circumstances.
"The potential existence of nonstatutory mitigating circumstances come from further consideration of Doctor Chudy's testimony and that of his mother. It is irrefutable that this Defendant is the product of an abusive environment woefully lacking in nurturance and emotional support. These factors, though regrettable, are not a license for violence, nor do they justify any act of senseless rage directed at an innocent human being. Were this the case every person from a deprived background could explode at will without fear of consequence.
"Likewise, the Defendant's lack of intelligence is not an excuse for murder, especially in the context of this case. The Defendant knew he had `F ____ Up' and while in control as he savagely attacked Durk Van Dam.
"Therefore, these nonstatutory circumstances though thoughtfully considered and applied, do not merit significant consideration."
(R. 190). The trial court found the existence of three aggravating circumstances, §§ 13A-5-49(1), 13A-5-49(4) and 13A-5-49(8): that Smith was under a term of imprisonment for two burglary convictions and one receiving-stolen-property conviction at the time of the robbery-murder; that the murder of Van Dam occurred during the course of a robbery; and that the murder was especially heinous, atrocious, or cruel as compared to other capital *842 offenses. We agree with the trial court's findings.
Section 13A-5-53(b)(2) provides that we must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Smith's sentence of death. After an independent weighing, we are convinced, as was the trial court, that death is the appropriate sentence for Smith's conduct.
Section 13A-5-53(b)(3) provides that we must address whether Smith's sentence is disproportionate or excessive to other penalties imposed in similar capital cases. Smith's conviction is neither. "In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder." McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1998).
Last, we have searched the entire record for any error that may have adversely affected Smith's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Smith's conviction and sentence to death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] At the time of the robbery-murder Smith had not completed the remainder of his sentence on convictions for two counts of burglary and one count of receiving stolen property. On November 21, 1997, Smith was placed on Prediscretionary Leave, which is a community-custody program where the inmate can live at home and work in the community. Betty Teague, director of the central records office for the Alabama Department of Corrections, testified that an inmate who is nearing the end of his sentence may be placed in this program.
[2] M.A. is a juvenile with a juvenile record. In keeping with the laws designed to protect the anonymity of juvenile offenders we are using this witness's initials. § 12-15-72, Ala.Code 1975, and Rule 52, Ala.R.App.P.
[3] Batson applies to white prospective jurors, see White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993), and to defense counsel, see Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).
[4] The record contains no formal written motion to suppress the statements. The record concerning defense counsel's objections to the statements is very confusing. At one point the trial court stated: "Well, you know, one thing that would have been nice would have been to get a written motion so we would know exactly what it is you're objecting to." (R. 180.) It does appear that counsel objected on the basis that the statements were involuntary, that police failed to satisfy the Miranda requirements, that the time between the statements was too long and that Miranda warnings should have been given again, and that Smith had been coerced into making a statement.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Though this information is not contained in the record of the suppression hearing, Detective Reynolds testified as to this before the jury. "In reviewing a trial court's ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial." Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985).
[7] Even if were to conclude that Smith should have been advised of his Miranda rights before the first statement, which we do not, we would still hold that the second statement was accompanied by the appropriate Miranda warnings and would not be inadmissible on that basis. As this Court stated in Hogan v. State, 663 So.2d 1017, 1020 (Ala.Cr.App. 1994):

"We reject the appellant's first argument on the authority of Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Cleveland v. State, 555 So.2d 302, 304 (Ala. Cr.App.1989), and Scott v. State, 555 So.2d 763 (Ala.Cr.App.1988).
"In Scott, this court approved the following analysis by the trial court:
"`The Court finds that even if the statement by the defendant to Officer Sharp was inadmissible because of a failure to give the complete warning under Rule 11(A), [Ala.R.Juv.P.,] the second statement to Nesmith and Lee would not necessarily be rendered inadmissible as a result. In Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court held that a statement given after proper Miranda warnings is not tainted by an earlier unwarned statement where both statement are voluntary....'"
[8] "In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that admission of the confession of a nontestifying defendant, implicating his codefendant in the crime, violated the codefendant's rights under the Confrontation Clause of the Sixth Amendment, notwithstanding any cautionary instructions to the jury." Sneed v. State, 783 So.2d 841, 847 (Ala.Cr.App.1999).
[9] The coroner testified that the rib fractures that caused the collapsed lung were probably the most immediate cause of death. "[W]hen you fracture multiple ribs and you no longer have the integrity of the space that holds your lung the lung will collapse and that's probably what happened here. He has probably a pneumothorax and a collapsed lung and his rib fractures are probably his most life-threatening injury." (R. 623.)
[10] The Alabama Supreme Court in Ex parte Cothren, 705 So.2d 861 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998), characterized a confession as the "centerpiece" of the State's case against an accused.